Patricia A. SMITH et al., Appellants,

v.

**BOARD OF COMMISSIONERS OF the DISTRICT OF COLUMBIA et al., Appellees.**

**No. 20746.**

United States Court of Appeals District of Columbia Circuit.

Argued May 17, 1967.

Decided June 23, 1967.

Mr. Peter S. Smith, Washington, D. C., with whom Messrs. David H. Marlin and Laurens H. Silver, Washington, D. C., were on the brief, for appellants.

Mr. John R. Hess, Asst. Corp. Counsel for District of Columbia, with whom Messrs. Charles T. Duncan, Corp. Counsel, and Hubert B. Pair, Principal Asst. Corp. Counsel, were on the brief, for appellees. Mr. Milton D. Korman, Principal Asst. Corp. Counsel at the time the record was filed, also entered an appearance for appellees.

Messrs. Daniel Marcus and David L. Chambers, III, Washington, D. C., filed a brief on behalf of the National Capital Area Civil Liberties Union, as amicus curiae urging reversal.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

This appeal is from a grant by the District Court of summary judgment in an action seeking declaratory and injunctive relief in respect of the administration of the District of Columbia Aid to Families with Dependent Children program. 3 D.C. Code § 202 *et seq.* (Supp. V, 1966). Appellees are the District Commissioners and other officials having responsibilities in that regard. Appellants are mothers of needy children receiving assistance under the program, suing for themselves and others similarly situated. The District Court in its opinion, 259 F.Supp. 423, identified a number of reasons as independently supporting its decision. One was the failure of appellants, prior to invoking the aid of the District Court, to pursue avenues of administrative relief allegedly open to them. We address ourselves only to this ground, because we think it warrants our affirmance of the judgment appealed from.

## I

The claims made by appellants purport to be derived from the Civil Rights Act, 42 U.S.C. § 1983 (1964), the text of which is set forth in the margin.[1] Their complaint as filed alleged that appellees administer the AFDC program in a manner inconsistent with relevant statutes and, more significantly, in such a way as to deprive appellants of rights assured them by the Constitution. In particular, it is said that, on numerous occasions, since 1961, named and unnamed investigators for the Department of Welfare have unlawfully entered upon the premises of appellants and conducted interrogations and surveillances in an arbitrary and unreasonable fashion. It is represented that appellees threaten to, and do, terminate assistance payments unless appellants passively accept this continuing assault upon their constitutional privileges; and that appellants have not heretofore resisted this conduct for fear of losing the benefits due them under the law. Nothing is alleged as to the making of protests to higher authorities about these practices, nor about efforts to secure formal administrative relief against them.

The District Court was asked to declare that this kind of administrative tyranny infringed upon a variety of constitutional rights, most notably those which inhere in the Fourth Amendment. The injunctive relief sought was to the effect that appellants' homes be not entered except under the authority of a search warrant or the uncoerced consent of the occupant; and that assistance payments be not used as a club to exact an unwilling consent.

1. "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The procedural posture of the matter in the District Court was that the complaint elicited an alternative motion to dismiss or for summary judgment. This motion was accompanied by an affidavit by the appellee Director of the Department of Public Welfare representing that none of the Department's employees was authorized to enter the premises of any welfare recipient without the latter's prior consent, and that none of appellants were currently in jeopardy of losing their benefits for refusing such consent. After hearing counsel, the District Court, as noted above, awarded summary judgment to appellees.

The breadth of some of the propositions of law espoused by the District Court as justifying its ruling has not unnaturally put the appellants, and the *amicus*, at some pains to refute them. With respect to such matters as the standing of appellants to sue, the jurisdiction of the District Court to entertain the action, and the availability of Fourth Amendment protections to persons situated as are appellants, we may assume for present purposes the validity of the arguments pressed upon us.[2] But these assumptions leave unanswered the question of whether appellants are prematurely in court in terms of the possibilities open to them of administrative relief. We think they are; and that, in this

respect at any rate, the District Court was on firm ground.

## II

Appellants do not complain of anything in the statutory framework of the AFDC program. Neither does their complaint attack any of the regulations under which the program is administered. Indeed, in the District Court hearing counsel for appellants signified his awareness of the existence of written regulations issued for the guidance of Welfare Department investigators, and told the court that "if they were obeyed we wouldn't be here this morning."[3] The District Court was, thus, confronted with what was essentially a challenge to the assertedly unlawful manner in which certain employees were performing their duties under an unexceptionable statute and concededly permissible regulations, and a request that judicial correction be afforded in essentially the form of a broad injunctive command to their superiors. As remarked above, the complaint does not allege that any effort was ever made to secure this relief directly from any of the appellees having authority over the program. We inquire, therefore, as to what provision Congress or the appellees, or both, have made for such internal relief.

Congress has written into the statute a direction that any aggrieved welfare

---

2. Appellees' brief on appeal states a single question, *i. e.*, the failure of appellants to exhaust the administrative remedy available to them. But appellees appeared to find it hard to pursue this point with single-minded devotion. For example, they felt impelled to debate with appellants the continued force of Frank v. State of Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959)—a matter which has now been settled by a more authoritative voice. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930, and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (both decided June 5, 1967). Neither of those cases, although effecting the demise of *Frank* and casting at least one of the District Court's grounds of decision into outer darkness, involves— much less governs—the exhaustion point

with which we are concerned. For a factually more closely related case, in which the California Supreme Court regarded welfare investigators as amenable to Fourth Amendment limitations, see Parrish v. Civil Service Commission, Cal., 57 Cal.Rptr. 623, 425 P.2d 223 (1967).

3. Also in the course of the hearing, counsel characterized the Welfare Department's regulations as stating "that if an investigator wishes to gain admittance into the home of a recipient and that admittance is denied, the investigator should turn around and leave the home." This was in the context of an apparent effort to contend that these regulations, proper in form, were being subverted in fact by threats by the field investigator to terminate assistance and to withdraw children from parental custody if consent to entry was not forthcoming.

client "shall be entitled to a hearing * * * conducted in accordance with rules and regulations prescribed by the Commissioners. * * *" 3 D.C. Code § 214 (Supp. V, 1966). These last are contained in a Handbook of Public Assistance Policies and Procedures. The Handbook has this to say, respectively, of the authority under which hearings are provided and the objectives they are designed to advance:

## THE HEARING PROCESS

### I. AUTHORITY

The Public Assistance titles of the Social Security Act, the Public Assistance Law of the District of Columbia, Commissioners' Orders, and Departmental Directives require that the agency provide an opportunity for a fair hearing to any individual who is dissatisfied with any action or failure to act on the part of the agency. The agency recognizes this requirement in all of the regular financial assistance programs.

The establishment of the hearing process in Public Assistance is in keeping with the requirement of the Federal Administrative Procedures Act which provides that any decision or action of an administrative agency of the Government shall be subject to review in an administrative hearing, and, if the citizen is still dissatisfied, to test in the courts.

\* \* \* \* \* \*

### III. OBJECTIVES

The following are some of the major objectives of the hearing process in Public Assistance:

A. To enable the Public Assistance Division, the Departmental Office, and the claimant to ascertain jointly the factual basis on which, through proper application of the assistance law and agency policies, a just and equitable decision may be reached.

B. To safeguard applicants and recipients from mistaken, negligent, unreasonable, or arbitrary action by agency staff.

C. To reveal aspects of agency policy that are inequitable or constitute a misconstruction of law, of Commissioners' Orders or of Departmental Directives. It is intended to submit policy to test and argument, and to place in the hands of policy-making officials evidence indicating the need for modification of policies and standards, and the nature of the needed modification.

The Handbook goes on to provide that each request for a hearing shall eventuate in a final written decision within 60 days from such request; and that the Hearing Officer "shall conduct the hearing in such a manner as to insure that both the claimant and the agency have opportunity to present all facts which in their judgment have a bearing on the hearing." A transcript is made of the proceedings; the complainant may be represented by counsel or other representative of his choice; and he or his representative may examine and cross-examine witnesses, introduce documentary evidence, and present oral argument.

Appellants have argued to us that these complaint and hearing procedures are unavailing as to them because they are restricted to issues of eligibility for assistance and levels of allowance, and that they do not embrace grievances deriving from unlawful and arbitrary acts by investigators in the performance of their duties. It is patently true that eligibility determinations bulk large in the business to be dispatched by the hearing process, but we do not read the language of either statute or regulation so narrowly as do appellants. Indeed, we find it hard to conceive of more apt language, in relation to the nature of appellants' grievance, than that set forth in the Handbook, and quoted above, in Paragraphs B and C under the heading of "Objectives."

In any event, we do not have to speculate about how appellees construe the statute and the regulations. Both in

brief and oral argument they have represented to us that they abjure the limited construction advanced by appellants, and that they regard the complaint and hearing procedure as plainly accessible to appellants for an airing and resolution of their objections to the allegedly unlawful and improper course of conduct of departmental personnel. In view of these explicit assurances, to which we attach the highest importance in terms of the immediate availability to appellants of the departmental hearing procedure as a forum for their complaints, it is bootless for appellants to persist in arguing to us that they have nowhere to go but to court. That may come later, as the Handbook itself appears to contemplate in its reference to "test in the courts" by the "citizen [who] is still dissatisfied" after the administrative proceeding is over.

Appellants insist, however, that, even though an administrative remedy be open to them, they need not pursue it. They recognize that this position is in conflict with the general rule, but like all general rules, they say, this one has its exceptions. Two of these last are claimed as applicable to this case.

First, it is said that exhaustion of administrative processes is not necessary where there are no facts in controversy and the only issue is whether administrative policies and actions violate the Constitution or statutes of the United States. Relying upon Public Utilities Commission of State of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958), appellants insist that the only issue for exploration

is the legal one of whether appellees may impose upon welfare recipients the requirement that they either submit to unconstitutional searches, or forfeit their assistance payments. This is, to say the least, a very free rendering of the relevance of *Public Utilities Commission* to this case.[4] It falters, at all events, in its assumption that there are no factual issues the ventilation of which would be helpful to the definition and resolution of the legal questions here involved. All we can see from the record before us is a denial by affidavit that welfare investigators are authorized to go upon the premises of welfare clients without the consent of the latter; and a further denial that appellants stand under any present threat of losing benefits by reason of their refusal to give such consent.

Appellants make much of the fact that this latter denial is qualified by the words "at this time." They claim that this tell-tale phrase establishes incontrovertibly the fact that appellees do deliberately expose welfare recipients to a Hobson's choice of either abandoning their constitutional rights or foregoing the statutory benefits to which they would otherwise be entitled. We confess to being left by this record in the predicament—not infrequent where there has been no subjection of allegations in complaint and affidavit to the rigors of an evidentiary hearing—of not being clear as to just what the facts are. We are convinced that the establishment of the precise shape of those facts would be very helpful, if indeed not critical, to measurement by constitutional stand-

4. The question in *Public Utilities Commission* was whether the United States could be required to subject to prior approval through State regulatory procedures preferential rates negotiated by it with common carriers. The Supreme Court held that the United States could, without engaging in a rate case before the California Commission, seek a declaratory judgment that the state statute was unconstitutional. The purpose of California to enforce the statute was clear, and its applicability in terms to the United States was equally plain. The is-

sue was, as the Court said, solely "a constitutional one that the Commission can hardly be expected to entertain"; and there was no possibility whatsoever that, "as in Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796, and Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933, an administrative proceeding might leave no remnant of the constitutional question. * * *" 355 U.S. at 539–540, 78 S.Ct. at 450.

ards. The Fourth Amendment, for example, bans "unreasonable" searches. The only way an abstraction of that kind can be made meaningful is by reference to facts which are as concrete and exact as the adversary hearing process can make them.[5]

We are prepared to believe that the controversy appellants tender may well have constitutional overtones. We are not prepared to say that the wise and responsible resolution of such issues will not be aided by careful and complete factual inquiry, nor that such inquiry here is supererogatory. Congress has provided a forum for such inquiry at the administrative level; and we are not persuaded that that provision should be ignored in favor of the inquiry's being pursued for the first time in the District Court.

Appellants' second exception is that simple and unalloyed constitutional issues are for judges to decide, not administrators. And it is urged that this is especially true of suits arising under the Civil Rights Act, as witness McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

What we have said above about the importance of facts, however, suggests that they have a way sometimes of defiling the purity of legal questions, and even of making constitutional issues not constitutional at all. They have not been unknown to make the issue, constitutional or not, go away altogether. We do not infer that this is likely to happen here, but it is obviously one of the offices of the administrative hearing provided by Congress to exhaust these possibilities. The District Court could not identify—much less dispose of—the legal questions raised by the complaint without extensive evidentiary hearings and the making of many findings of fact. Where this task has been committed to the administrative process in the first instance, courts do not ordinarily insist upon doing this job themselves.

*McNeese* is not concerned with the exhaustion of administrative remedies as such before invoking judicial relief. Its focus is upon the need to delay asserting a *federal* right in a *federal* court, as distinct from first seeking its vindication in state tribunals, whether these last be administrative or judicial.[6] We remind that here we have no true federal-state dichotomy. The District of Columbia is under the legislative jurisdiction of Congress. Its welfare program was enacted by Congress. It was Congress that provided an administrative remedy for the

5. It perhaps might be suggested that, since the Supreme Court has now held in *Camara* and *See* that search warrants must be used by health and fire department inspectors to obtain entry over the objection of the occupant, there remains only a question of law as to whether the same is true of welfare investigators. But the Court in *Camara* was careful to note that "it seems likely that warrants should normally be sought only after entry is refused * * *." 87 S. Ct. at 1736. Appellants have nowhere alleged that entries are made without consent. What they have challenged is the voluntariness of the consents being given; and, as to this, there would appear to be a factual dispute requiring resolution.

6. The Court of Appeals for the Second Circuit, in a characterization of *McNeese*, has emphasized that its doctrine does not turn on the distinction between judicial and administrative remedies, but derives from the urgency of providing a federal forum for the assertion of a federal right. In Powell v. Workmen's Compensation Board, 327 F.2d 131, 135 (2 Cir. 1964), it said that "relief is not to be denied under the Federal Civil Rights Statutes because of failure to exhaust available state remedies of either an administrative or judicial nature." In that case the court went on to uphold a dismissal of the complaint after finding that the state administrative processes had in fact been exhausted and that, in any event, the complaint failed to state a cause of action under the Civil Rights Act. In Rivers v. Royster, 360 F.2d 592 (1966), the Fourth Circuit did not, pending efforts to secure relief under state law, close the doors of the federal courts to a state prisoner alleging a clear denial to him of equal protection in a racial context. Cases like these present no analogy to the relationship between federal courts and federal administrative remedies.

hearing and resolution of complaints about the manner in which that program is administered. *McNeese* is far from suggesting that under these circumstances a court also created by Congress may not rationally give precedence to the administrative process.

Neither is there any reason to think that, in the phrase from *McNeese*, the departmental remedy here "though adequate in theory, [is] not available in practice." 373 U.S. at 672, 83 S.Ct. at 1435. The avenue of redress provided by the state in *McNeese* was highly contingent and uncertain, ending at best in a reference to the Attorney General for the taking of appropriate judicial action. Appellees here have the power, by appellants' own allegations, to give the full relief which appellants seek. What appellants appear to be after is a change in a general policy and practice which they believe to be arbitrary and unlawful. In the hearing which appellees have undertaken to afford, it will be open to appellants to show by the evidence of multiple witnesses other than themselves what the present policy and practice is, and why it is wrong and should be changed. A class action is not necessary either to accomplish this proof, or to obtain adequate relief. Appellants are not seeking individualized judgments but a change in an allegedly wrongful practice. If appellants do not get the relief they believe themselves entitled to, the courts remain open.

Neither may we assume from the record before us that appellants face utter and certain frustration in utilizing the administrative channel for relief which Congress has provided. It does not definitively appear at this juncture that the D. C. authorities having ultimate responsibility for the AFDC program have knowingly condoned action by field personnel of the kind alleged, or that there is a fixed and identifiable policy to countenance unconstitutional or unreasonable conduct. Appellees, like all other public officials, will have to assess the significance for their operations of the overturn of *Frank*. And we note, as did the California Supreme Court in *Parrish*, the significance of the action recently taken by the Department of Health, Education, and Welfare in this area. On March 13, 1966, it directed that local welfare programs, including that of the District of Columbia, must

> Include policies and procedures for determination of eligibility for assistance or other services that are consistent with the objectives of the program, and that respect the rights of individuals under the United States Constitution, the Social Security Act, title VI of the Civil Rights Act of 1964 * * * and all other relevant provisions of Federal and State laws, and that will not result in practices that violate the individual's privacy, or personal dignity, or harass him, or violate his constitutional rights.

H. E. W. HANDBOOK OF PUBLIC ASSISTANCE ADMINISTRATION

§ 2220, as amended by Transmittal 77.

Coincidentally HEW interpreted its new requirement in these terms:

> The prohibition against a State plan containing policies and procedures for determination of eligibility that will result in violation of privacy or personal dignity, that constitute harassment, or that violate constitutional rights, requires careful and continuing attention to practices and procedures that may result in violations of these rights and principles. By way of illustration, States must especially guard against violations in such areas as entering a home by force, or without permission, or under false pretenses, making home visits outside of working hours, and particularly making such visits during sleeping hours; and searching in the home, for example, in rooms, closets, drawers, or papers, to seek clues to possible deception.

*Id.* § 2230(1).

These directives become effective July 1, 1967, but, as emanations from the agency which controls the flow of funds,

they have undoubtedly already made their presence felt.

There are, of course, no absolutes about the doctrine of exhaustion of administrative remedies, any more than there are about the broader principle within which it is comprehended, namely, the traditional power of an equity court to choose among the occasions for the entertainment by it of applications for declaratory and injunctive relief. See Pharmaceutical Mfgrs. Ass'n. v. Gardner, 127 U.S.App.D.C. ——, 381 F.2d 271 (decided June 16, 1967). One of the strongest policies informing the exercise of that power is the undesirability on many counts of judicial haste in the preemption of tasks committed in the first instance to administrative processes. The District Court's declination of jurisdiction on this ground is securely rooted in this tradition.

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge, concurs in the result.