**BETHLEHEM STEEL CORPORATION,**
and
**Bethlehem Steel Company, Appellants,**

v.

**GRACE LINE, INC., Appellee.**

**No. 21050.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 24, 1968.

Decided March 6, 1969.

Petition for Rehearing Denied
April 24, 1969.

Mr. Ezekiel G. Stoddard, Washington, D. C., with whom Messrs. Max O. Truitt, Jr., and James Robertson, Washington, D. C., were on the brief, for appellants.

Mr. J. Alton Boyer, Washington, D. C., with whom Messrs. Odell Kominers and Michael Joseph, Washington, D. C., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and McGOWAN and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Bethlehem Steel Company, an appellant,[1] entered into substantially identical contracts in which it agreed to build four ships for Grace Line, Inc., the appellee. The United States,[2] through the Federal Maritime Board, made this a tripartite venture by awarding Grace a construction-differential subsidy.[3] The contracts required Bethlehem to construct the vessels in accordance with plans and specifications which, among many other things, designated the cubic capacities for each ship's refrigerated holds (reefers) for banana cargoes. The contracts also fixed staggered delivery dates which, however, were extendible to absorb delays beyond Bethlehem's control, and provided for liquidated damages for unexcused tardiness. The contracts further provided for predelivery inspections and trials, and

---

1. The other appellant is Bethlehem Steel Corporation, joined by appellee's complaint as an original defendant on allegations that it had succeeded to the shipbuilding operations and liabilities of Bethlehem Steel Company involved in this case. Both of the Bethlehem concerns are hereinafter collectively referred to as "Bethlehem."

2. The United States, by the Federal Maritime Board, was a party to the contracts. See, however, note 8, *infra*.

3. Pursuant to the Merchant Marine Act of 1936, § 501 et seq., 48 U.S.C. § 1151 et seq. (1964), the Federal Maritime Board is authorized to grant a subsidy to defray a portion of the costs incurred by domestic shipyards in producing vessels capable of competing with those constructed by foreign shipbuilders.

for a guaranty period and a final guarantee survey after delivery.[4] Additionally, a "disputes clause" in each contract required "[a]ny dispute arising under this contract" which the parties did not settle to be submitted to the Maritime Administration for resolution.[5]

During the course of and upon completion of performance, Grace questioned Bethlehem's compliance with certain of its contractual obligations. The initial disagreement arose from delays in deliveries of each of the four ships. Bethlehem asked the Maritime Administration to extend the contract delivery dates for the first three vessels on the ground that it had encountered obstacles beyond its control, and Grace opposed the requested extension. The questions in this regard remained pending before the Maritime Administration when the parties' difficulties reached court.[6]

As each completed ship was handed over to Grace, and again six months thereafter, Grace compiled and presented to Bethlehem and the Maritime Administration lists of alleged defects in material and workmanship. The lists included faulty sea valves and related equipment in the salt water system of each vessel, which Bethlehem thereafter undertook to rectify. Upon each transfer, Grace also noted "an open question" with respect to the cubic capacities of the banana reefers. After the final guarantee surveys of the delivered ships, the Maritime Administration's Survey Board, in each instance, disposed of Grace's statement of "open question" with the comment that it "does not consider this above statement to be a deficiency in workmanship or material as defined by Article 14 [the guaranty clause] of the subject contract."[7] Grace subsequently informed Bethlehem

4. The guaranty clause, in relevant part, provides:
   Article 14. Guaranty Period—Liability for Defective Work or Material.—(a) Notwithstanding any inspection or failure to reject by the Owner or any regulatory body pursuant to Article 9 of these General Provisions, if at any time within six (6) months after the delivery of the Vessel any weakness, deficiency, defect, failure, breaking down or deterioration in workmanship or material furnished by the Contractor in performing the contract work (herein called "defective workmanship" or "defective material") shall appear or be discovered, such defective workmanship or defective material shall be made good, at the Contractor's expense, to the requirements of the Plans and Specifications and of this Contract. * * *
   (b) The Owner shall notify the Contractor of any defective workmanship or defective material or damage for which the Contractor is liable pursuant to paragraph (a) above, discovered or appearing within the guarantee period. * * *
   (c) A final guarantee survey of the vessel shall be conducted by the Maritime Administration's Guarantee Survey Board at the Expiration of the guarantee period, or as soon thereafter as the Owner shall deem practicable, but no later than six (6) months after the expiration of such guarantee period. Such survey shall be based on the de-

fective workmanship and defective material in the contract work appearing or discovered during the guarantee period. * * *

5. The disputes clause provides:
   Article 36. Disputes—Any action, omission, direction, decision or determination of the Board, the Owner or the Contractor under this contract may be the subject of a dispute. Any dispute arising under this contract which is not disposed of by agreement of the parties to this contract, shall be decided by the Chief, Office of Ship Construction, of the Maritime Administration, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor and to the Owner, which decision shall be final and conclusive and shall bind all parties to this contract unless within thirty (30) days from the date of receipt of such copy the Contractor or the Owner appeals from said decision by mailing or otherwise furnishing said Chief, Office of Ship Construction, a written appeal addressed to the Board.

6. Two days after Grace filed its complaint in this case, the Maritime Administration granted Bethlehem's extension request in part. Both Bethlehem and Grace took exception to that determination.

7. Quoted *supra* note 4. See also note 57, *infra*.

that it had verified substantial space shortages in the banana holds in each vessel, from which sizeable losses of revenue to Grace were anticipated.

Grace later brought an action against Bethlehem[8] in the District Court seeking damages for breach of contract resulting from the alleged banana reefer deficiencies, late deliveries and defective sea valves.[9] Invoking the disputes clause,[10] Bethlehem then requested the Maritime Administration to add to the pending contest over the belated deliveries the claims respecting the banana reefers and the sea valves. Grace, on the other hand, resisted administrative consideration of these problems insisting that the disputes clause was limited in operation to disputes "arising under" the contracts, and thus to those deferable to adjustment procedures afforded by the contracts, and that it did not apply to the breach of contract bids for damages.

Bethlehem thereafter filed a motion in the District Court to dismiss the counts incorporating the banana reefer and sea valve claims and three of the counts based on overdue deliveries,[11] without prejudice to their litigation after the completion of administrative proceedings thereon. As grounds for the motion, Bethlehem urged that the court lacked subject matter ju-

risdiction and that Grace had failed to exhaust the administrative remedies provided by the disputes clause. In opposition, Grace contended that the banana reefer issue was not subject to the disputes clause procedure. Grace added that it would not object to administrative consideration of the late delivery and sea valve questions, and urged that the suit as to them should be stayed, rather than dismissed, pending the outcome of such proceedings.[12] Bethlehem then modified its motion so as to request a stay, instead of a dismissal, of all three controversies pending their administrative resolution.

■ The District Court accepted the motion as an application for a stay. With Grace's acquiescence, it stayed the action as to the delayed delivery and sea valve counts, but denied a stay with respect to the banana reefer controversy. The court held that "as a matter of law" Grace's claims of undersized banana reefers "are not subject to the 'disputes clause' of the contracts in suit or to administrative proceedings thereunder." This appeal by Bethlehem contests the validity of that ruling, and presents for our decision the question whether the disputes clause encompasses Grace's demand for damages on account of the asserted deficiencies in the banana reefers.[13]

8. The United States was originally joined as a defendant simply because it was a party to the contracts in suit, and no relief against it was sought. The District Court granted its motion for dismissal for failure of the complaint to state a claim upon which relief against it could be granted.

9. Liquidated damages were sought on the counts alleging delayed deliveries of the ships and compensatory damages on the counts charging deficiencies in reefer capacities and defective sea valves.

10. Quoted *supra* note 5.

11. The motion did not, however, touch a count in the complaint seeking liquidated damages on account of the delayed delivery of the fourth vessel.

12. Urging the propriety of an action to toll the statute of limitations during the period of administrative proceedings,

Grace pointed to Crown Coat Front Co. v. United States, 363 F.2d 407, 413 (2d Cir. *en banc* 1966), holding that the limitation period specified by 28 U.S.C. § 2401(a) (1964) for a contractor's suit against the United States was not suspended while the contractor's claim was under administrative consideration. The Supreme Court later reversed that decision and held that where administrative proceedings on a contractor's demand subject to the disputes clause extend beyond the completion of the contract, his cause of action "first accrues," within the statutory language, only when the administrative action is final. Crown Coat Front Co. v. United States, 386 U.S. 503, 522, 87 S.Ct. 1177, 18 L.Ed.2d 256 (1967).

13. Grace questions our jurisdiction to entertain this appeal, but it is clear that we are empowered to review the order denying a stay of the banana reefer controversy as an order refusing an interlocutory injunction against litigation of

## I

In United States v. Utah Construction and Mining Company,[14] the Supreme Court had occasion to delineate the scope of the fact-disputes clause constituting Article 15 of the standard government-wide construction contract. That clause requires "all disputes concerning questions of fact arising under this contract" to be submitted to the government's contracting officer, and provides that the officer's decision, subject to a departmental appeal, "shall be final and conclusive upon the parties thereo."[15] In *Utah Construction,* a contractor who, by the standard contract, had undertaken the construction of a facility for the Atomic Energy Commission, subjected several demands to the administrative proceedings contemplated by Article 15. After adverse determinations, the contractor framed a breach of contract action in the Court of Claims against the Government predicated upon those demands. The Court of Claims construed Article 15 as confined to "disputes concerning questions of fact *arising under this contract,*" meaning "a dispute over the rights of the parties given by the contract," and not "a dispute over a violation of the contract."[16] In other cases, to which the Supreme Court in *Utah Construction* referred,[17] the Court of Claims had held[18] "that to the extent complete relief is available under a specific contract adjustment provision, * * * the controversy

that controversy in the District Court, under the provisions of 28 U.S.C. § 1292(a) (1) (1964). As we have heretofore said, "[w]here the stay sought is of an action that would have been an action at law before the fusion of law and equity, the grant or denial of such stay is appealable * * *." Travel Consultants, Inc. v. Travel Management Corp., 125 U.S. App.D.C. 108, 111, 367 F.2d 334, 337 (1966). See also Shanferoke Coal & Supply Corp. of Delaware v. Westchester Serv. Corp., 293 U.S. 449, 451–452, 55 S.Ct. 313, 79 L.Ed. 583 (1935). And see Ettelson v. Metropolitan Life Ins. Co., 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942); Enelow v. New York Life Ins. Co., 293 U.S. 379, 381–383, 55 S.Ct. 310, 79 L.Ed. 440 (1935). *Cf.* Baltimore Contractors v. Bodinger, 348 U.S. 176, 180–185, 75 S.Ct. 249, 99 L.Ed. 233 (1955). The District Court's action, when taken here, was on Bethlehem's motion for a stay, albeit a stay in lieu of a dismissal, of Grace's banana reefer counts for compensatory damages. Grace's suit in that regard was by any definition an action at law.

Bethlehem, on the other hand, sharing our view that its motion for a stay was a prayer for an interlocutory injunction, points out that the District Court's order denying the stay of the banana reefer dispute was not accompanied by findings of fact, which are required when such an injunction is granted or refused. F.R. Civ.P. 52(a). To the limited extent to which that circumstance has importance on this appeal, we treat it in the text *infra* at note 40.

Finally, Bethlehem argues that, irrespective of possible correctness of the District Court's ruling, it was error for it to undertake a determination of the applicability of the disputes clause to the banana reefer controversy. Invoking the doctrines of primary jurisdiction and exhaustion of administrative remedies, Bethlehem contends that the District Court should have referred to the Maritime Administration for its decision the question whether the banana reefer dispute was subject to administrative proceedings under the disputes clause. We treat that position in Part IV, *infra.*

14. 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed. 2d 642 (1966).

15. "Article 15. Disputes. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed."

16. Utah Constr. & Mining Co. v. United States, 339 F.2d 606, 609–610, 168 Ct.Cl. 522 (Ct.Cl.1964).

17. 384 U.S. at 402, 86 S.Ct. 1545.

18. The characterizations of the Court of Claims' holdings in the text *infra* at notes 19–20 are those made by the Supreme Court. See notes 19–20 *infra.*

falls within the disputes clause," [19] but "that when only partial relief is available under the contract * * * the remedies under the contract are not exclusive and the contractor may secure damages in breach of contract if the Government's conduct has been unreasonable." [20]

In the Supreme Court, the Government argued,[21] as it had done previously in the Court of Claims, that "the disputes clause authorizes and compels administrative action in connection with all disputes arising between the parties in the course of completing the contract," [22] and that the clause "is not limited to those disputes arising under other provisions of the contract * * * that contemplate equitable adjustment in price and time upon the occurrence of the specified contingencies." [23] Alternatively, the Government urged "that even if it be accepted that the Boards of Contract Appeals are without jurisdiction to grant relief for breach of contract they are nevertheless authorized by the disputes clause to make binding findings of fact respecting all disputes." [24]

The Supreme Court, however, rejected the Government's position and affirmed the Court of Claims' interpretation as to the breadth of the Article 15 disputes clause. It examined exhaustively the "uniform, continuous, and longstanding judicial and administrative construction of the disputes clause," [25] and concluded that the test to be employed in distinguishing claims within the disputes clause procedure from those outside that procedure is whether the controversy is fully redressable under a provision of the contract other than the disputes clause itself.[26] It affirmed the Court of Claims' interpretation that "to the extent complete relief is available under a specific contract adjustment provision, * * the controversy falls within the disputes clause * * *." [27]

■ And so it is now settled that the fact-disputes clause extends only to controversies redressable by specific provisions in the contract.[28] Stated differently, a fact-dispute is one "arising under this contract" only when the disputed fact is capable of complete resolution by a procedure specified in the contract. In consequence, claims which are adjustable under contractual provisions must be submitted for the administrative determinations prescribed by the contract, while claims for breach of contract—those not adjustable in that fashion—may be litigated in a court of competent jurisdiction without previous resort to that procedure.

II

■ In 1958, prior to execution of the contracts now before us, the Maritime Administration eliminated from its contract form the standard fact-disputes clause [29] and substituted therefor the ver-

19. 384 U.S. at 402, 86 S.Ct. at 1550 (citation omitted).

20. Id. (citations omitted).

21. The characterizations of the Government's arguments in the text infra at notes 22–24 are those made by the Supreme Court. See notes 22–24, infra.

22. 384 U.S. at 403–404, 86 S.Ct. at 1551.

23. Id. at 404, 86 S.Ct. at 1551.

24. Id. at 407–408, 86 S.Ct. at 1553.

25. Id. at 405, 86 S.Ct. at 1551.

26. Id. at 412–418, 86 S.Ct. 1545.

27. See the text supra at note 19.

28. Typical of provisions that may afford adequate remedies contractually are those specifying formulas for equitable adjustments in costs and price, and those conferring time extensions in appropriate situations. As the Court observed in Utah, "in one respect it can be said that clauses broadening remedies under the contract have been adopted in response to restrictive interpretation of the disputes clause * * *." 384 U.S. at 417, 86 S.Ct. at 1557.

29. Quoted in note 15, supra.

sion in suit.[30] There was added, as the first sentence, a specification that "[a]ny action, omission, direction, decision or determination of the Board, the Owner or the Contractor under this contract may be the subject of a dispute." Additionally, the language "all disputes concerning questions of fact arising under this contract" was changed, in what became the second sentence, to read "[a]ny dispute arising under this contract which is not disposed of by agreement of the parties to this contract."

The factors motivating these alterations of the disputes clause have not been presented to us. Nonetheless, it is clear that the new 1957 clause has in some respects a wider reach than the standard fact-disputes clause construed in *Utah Construction.* Bethlehem maintains that the language "[a]ny dispute arising under this contract" in the second sentence embraces any matter which the first sentence describes as a potential subject of dispute, and compels the adjustment through the administrative machinery of all disagreements between the parties concerning "[a]ny action, omission, direction, decision or determination" stemming from any of the myriad provisions of the contracts.

We cannot accept this construction, or attribute to the new first sentence the capability of superimposing on the second a coverage nearly so broad or radical. The first sentence purports to require consideration by the Maritime Adminis-

tration of *administratively referable* disputes over matters in character either legal or factual,[31] judgmatical or ministerial, or otherwise outside the "fact" category of the standard disputes clause terminology. But the vital circumstances confronting us here is that the words "arising under this contract" remain in the second sentence, as they appeared in the old, and their influence on the problem at hand must be weighed with great care. For, despite the specification in the first sentence as to what "may be the subject of a dispute," the only type of dispute the second sentence makes mandatorily subject to the administrative procedure is one "arising under this contract."

That phrase—"arising under this contract"—has a lengthy history,[32] throughout which it has commanded widespread acceptance as an unyielding limitation on administrative reference to disputes that can be fully remedied under some stipulation of the contract.[33] As the Supreme Court very recently pointed out, "[t]he 'arising under' claims subject to final administrative determination are those claims asserted under other clauses of the contract calling for equitable adjustment of the * * * price or extensions of time upon the occurrence of certain events."[34] If indeed the Maritime Administration's purpose had been to recast its disputes clause to free it from that constriction, all it had to do was to eliminate the constricting language. Instead

30. Quoted in note 5, *supra.* In 1967, the Maritime Administration again revised its *pro forma* disputes clause. 32 Fed.Reg. 7174 (1967).

31. Compare United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256 (1950). Under the Wunderlich Act, 41 U.S.C. § 322 (1964), quoted *infra* note 55, however, the administrative decision on the legal question is not binding.

32. See United States v. Utah Constr. & Mining Co., *supra* note 14, 384 U.S. at 405–418, 86 S.Ct. 1545; Shedd, Fragmentation of Remedies—The "All-Disputes" Solution, 28 Fed.B.J. 185, 189–197 (1968); Shedd, Disputes and Appeals: The Armed Services Board of

Contract Appeals, 29 Law & Contemp. Prob. 39 (1964).

33. United States v. Utah Constr. & Mining Co., *supra* note 14, 384 U.S. at 407, 86 S.Ct. 1545; Shedd, Fragmentation of Remedies—The "All-Disputes" Solution, 28 Fed.B.J. 185, 189, 190–191 (1968); Lane, Administrative Resolution of Government Breaches—The Case for an All-Breaches Clause, 28 Fed.B.J. 199, 207–208 (1968); Shedd, Disputes and Appeals: The Armed Services Board of Contract Appeals, 29 Law & Contemp.Prob. 39, 73–74 (1964).

34. Crown Coat Front Co. v. United States, *supra* note 12, 386 U.S. at 505–506, 87 S.Ct. at 1179.

it left it in the new formulation of the disputes clause, and we do not think the new first sentence can be understood to vitiate it. The important consideration here, no less than in *Utah Construction,* is that "the restrictive meaning of the words 'arising under this contract' had long since been established when these parties used them," [35] and upon that meaning the parties were entitled to rely in the absence of some clear indication that the words were to take on a wholly different significance. We think the new first sentence does not import such a modification.[36] The second sentence, we hold, excludes Grace's banana reefer claim unless it is subject to full administrative vindication under some other provision of the contracts.

### III

The only adjustment mechanism in the subject contracts relevant to the banana reefer contest is to be found in Article 14, the guaranty clause.[37] That provision, in substance, requires Bethlehem to remedy, at its expense, "defective workmanship or defective material" that "appear[s]" or is "discovered" within six months after delivery of a vessel. The District Court's refusal to stay proceedings on Grace's banana reefer counts implicitly rejected Bethlehem's position that Article 14 brought those counts within the purview of the disputes clause. This appeal, in turn, invites our examination of Article 14 with a view to determining whether it applies to reefer deficiencies and, if so, whether it provides the means for effecting a solution of the controversy concerning them.

Grace directs attention to three considerations in support of its position that the guaranty clause does not implicate the alleged banana reefer deficiencies. In the first place, says Grace, it was Bethlehem's responsibility to prepare working drawings permitting construction of the ships in accordance with the plans and specifications, and it was misperformance of that obligation which produced undersized banana reefers. Stated in simplest form, Grace's claim is that, when measured against the contract specifications with which Bethlehem was required to comply, the vessels as constructed are substantially scant in reefer capacity. Bethlehem's contention that it complied with the working drawings, Grace adds, is a concession that the deviation occurred in Bethlehem's translation of the specifications into working drawings. On these premises, Grace argues that the shortages in banana stowage are not defects either in "workmanship" or "material" within the meaning of the guaranty clause, but rather are flaws resultant from Bethlehem's design function.[38]

Bethlehem, on the other hand, contends that the situation is not the normal one wherein a mere concept is to be transformed into plans and specifications. For here Grace delivered plans and specifications which incorporated the ships' basic design, and which set inviolable limits within which Bethlehem had to formulate working drawings. Bethlehem also refers to a number of departures, authorized by Grace, from the plans and specifications during the course of construction, the effect of which on reefer sizes is unclear.[39] Consequently, any con-

---

35. 384 U.S. at 407, 86 S.Ct. at 1553.

36. In *Utah Construction,* the Court noted that the development of equitable adjustment provisions "illustrates not only administrative acceptance of the narrow interpretation of the disputes clause; it also indicates the lack of any compelling reason for overturning that interpretation at this late stage. Inclusion of such additional clauses in the contract naturally limits the area of disputes falling outside the framework of contractual adjustment and thus outside the disputes clause, as

does expansive construction of the existing adjustment clauses." 384 U.S. at 417–418, 86 S.Ct. at 1558.

37. Quoted in relevant part *supra* at note 4.

38. Compare Lombard Corp. v. Quality Aluminum Prods. Co., 261 F.2d 336, 338–339 (6th Cir. 1958).

39. Grace rejoins that Bethlehem failed to inform Grace of the effect of the changes.

clusion that the alleged reefer deficiencies resulted from misperformance of Bethlehem's design responsibilities is fraught with difficulty.

Grace's second argument against applicability of the guaranty clause stems from its obvious purpose to protect the shipowner who unqualifiedly accepts delivery against faults that come to light thereafter. Liability under the guaranty clause is narrow; it extends only to defects uncovered within six months, and is confined to repair or replacement. Grace contends that so limited a protection could not have been intended to supplant the shipowner's full panoply of legal remedies for predelivery imperfections. In this case, Grace reiterates, it noted an "open question," as to each of the four vessels at the time of their respective deliveries, with regard to conformance of the banana reefers with contract specifications. Thus, Grace urges, a condition precedent to activation of the guaranty clause—that the defect "appear or be discovered" *after* delivery—was not met. However, as we have observed, notwithstanding Grace's "open question" on reefer sizes at the time of each delivery, Grace did not present an unequivocal claim on that score until some six months later. Thus we cannot be sure that the deficiencies complained of "appear[ed]" or were "discovered" prior to delivery of the vessels.

This brings us to Grace's final contention respecting the inclusion of the banana reefer controversy within the guaranty clause. The sole remedy provided by that clause is the defect "be made good" by actual repair or replacement. Grace argues, with considerable merit, that the record does not demonstrate how the reefer deficiencies, by Grace's assessment about 48,000 cubic feet each, can now "be made good." Adverting to its view that the shortages result from an improper design of significant portions of each ship, Grace asserts that once they were completed the deficiencies could not be cured except by a process of dismantling, redesigning and rebuilding the vessels—a wholly unrealistic procedure. Concluding, then, that relief under the guaranty clause is illusory, Grace invokes the rule that a claim may be litigated judicially without prior administrative proceedings where the administrative remedy is unavailable or inadequate.[40]

On the other side of the ledger, however, are circumstances that cast at least some doubt on Grace's position. Bethlehem disputes Grace's computations on reefer capacities, both as promised and as delivered, and until these factors are stabilized it is impossible to ascertain the extent of any deficiency and, consequently, the potentialities of correction, pursuant to the guaranty clause, by alteration of the vessels or their equipment. We also note in this connection that Grace has already managed to substantially enlarge the reefers by the simple expedient of rearranging the equipment therein.[41]

Thus the record, in its present shape, leaves us uncertain as to the applicability of the guaranty clause to Grace's claim of undersized banana reefers, and as to the effectiveness of the remedial process it prescribes. For this reason, we are unable to say, as the District Court did, that "as a matter of law" the disputes clause does not encompass that claim. If the District Court, by that expression, meant that the decision should be made without resolution of the factual issues bearing on the applicability and efficacy of the guaranty clause, we think the court was in error. If, on the other hand, the court did undertake to determine those issues, we are confronted by two insurmountable problems. The first is the absence of findings of fact, to which Beth-

---

40. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 430, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966) ; United States v. Joseph A. Holpuch Co., 328 U.S. 234, 240, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946) ; United States v. Blair, 321 U.S. 730, 736–737, 64 S.Ct. 820, 88 L.Ed. 1039 (1944).

41. The record discloses that about 14,000 cubic feet per reefer was recouped in this fashion.

lehem points,[42] without which we could not perform our review function. The second, and far more fundamental, is the lack of evidence in the record to enable relevant factual findings. The matter came before the District Court on Bethlehem's motion, and was heard on the motion papers, several affidavits, numerous documents, and oral argument. There was no testimony, and the affidavits and documentary exhibits relate to other aspects of the case, and afford practically no assistance to solution of the factual disputes that block the path to any attempt at decision of the ultimate legal question. This condition of things, we recognized, was a natural consequence of presentations to the court by both sides predicated on litigative theories that do not harmonize with the approach we have outlined in this opinion.

In sum, a firm determination as to applicability and sufficiency of the guaranty clause can be made only upon such exploration as will remove the clouds now surrounding the facts essential to those decisions. We are unable to ascertain from the record whether the District Court treated the incidental factual disputes or, if it did, just what treatment it gave them. Moreover, Bethlehem contends that it is for the Maritime Administration, and not the District Court, to treat and decide the underlying factual issues.[43] Thus we reach the question as to the tribunal by which these determinations are to be made.

42. See note 13, *supra.*

43. See note 13, *supra.*

44. United States v. Utah Constr. & Mining Co., *supra* note 14, 384 U.S. at 404, 413, 86 S.Ct. 1545; United States v. Moorman, *supra* note 31, 338 U.S. at 460–461, 70 S.Ct. 288; United States v. Joseph A. Holpuch Co., *supra* note 40, 328 U.S. at 239–240, 66 S.Ct. 1000.

45. Compare United States v. Utah Constr. & Mining Co., *supra* note 14, 384 U.S. at 418, 86 S.Ct. 1545.

## IV

Absent a governing statute, references of contractual disputes for administrative decision are themselves the products of contract, for it is only by agreement that the dispute may be referred.[44] By the same token, the scope of the reference depends upon the contract, whether or not the crucial inquiry focuses on a provision for equitable adjustment.[45] "When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract."[46] And "whether and to what extent an adjustment is required are questions to be answered by the methods provided in the contract itself."[47] When a court is called upon to stay its hand pending administrative consideration and adjudication of a contractual dispute, it is, in effect, being requested specifically to enforce a stipulation requiring the reference. If the court is to award a stay, it is out of respect for a binding agreement between the parties to submit the subject of reference of administrative scrutiny. And it is clearly for the court to decide whether and as to what issues the parties have bound themselves to refer, unless their agreement is so broad as to commit even that question to administrative determination.

In the arbitration process, which apart from the degree of finality achievable is quite similar to administrative adjudication of contract disputes,[48] we perceive a

46. United States v. Utah Constr. & Mining Co., *supra* note 14, 384 U.S. at 404 n. 6, 86 S.Ct. at 1551. See also Crown Coat Front Co. v. United States, *supra* note 12, 386 U.S. at 511, 87 S.Ct. 1177.

47. Crown Coat Front Co. v. United States, *supra* note 12, 386 U.S. at 511, 87 S.Ct. at 1182.

48. Compare United States v. Anthony Grace & Sons, Inc., *supra* note 40, 384 U.S. at 433 n. 10, 86 S.Ct. at 1544. "[O]f course," as hte Court there pointed out, "the findings and conclusions of the Board of Contract Appeals do not have the same finality on review." *Id.*

persuasive analogy. "[A]rbitration is [similarly] a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." [49] Consequently, not only a party's obligation to arbitrate, but also "what issues [he] must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." [50] By parallel reasoning, we conclude that it is the District Court's task to decide whether the guaranty clause in the parties' contracts extends to the banana reefer controversy and, if so, whether and to what extent any necessary correction of the asserted reefer deficiencies can be achieved by alteration of the vessels or rearrangement of equipment therein.

■ But this is not to say that the factual investigations and findings precedent to that determination must be made wholly by the District Court. On the contrary, we think the court, in the exercise of its equitable powers, can enlist the aid of the Maritime Administration in the undertaking. We do not mean that the Administration would have the final word; as we have stated, that resides with the District Court. But in our view, the court can and should initially refer the dispute to the Administration, retaining jurisdiction to review its decision and pass final judgment on the matter.

■ That course would comport well with fundamental policy underlying the well settled rule that claims referable under the disputes clause for administrative adjustment cannot be entertained judicially until the required administrative procedures have been exhausted.[51]

49. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). See also Livingston v. John Wiley & Sons, Inc., 376 U.S. 543, 546–547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1967); Atkinson v. Sinclair Ref. Co., 370 U.S. 238, 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962).

50. Atkinson v. Sinclair Ref. Co., *supra* note 49, 370 U.S. at 241, 82 S.Ct. at 1320. See also Necchi S. P. A. v. Necchi Sewing Mach. Sales Corp., 348 F.2d 693 (2d Cir. 1965), cert. denied 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966). In Livingston v. John Wiley & Sons, Inc., *supra* note 49, 376 U.S. at 546–547, 84 S.Ct. at 913, where the Court, speaking of *Atkinson* and *Warrior & Gulf*, *supra* note 49, said: "The problem in those cases was whether an employer, concededly party to and bound by a contract which contained an arbitration provision, had agreed to arbitrate disputes of a particular kind. Here, the question is whether Wiley, which did not itself sign the collective bargaining agreement on which the Union's claim to arbitration depends, is bound at all by the agreement's arbitration provision. The reason requiring the courts to determine the issue is the same in both situations. The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty."

The Federal Arbitration Act § 4, 9 U.S.C. § 4 (1964), authorizes an order "to proceed to arbitration in accordance with the terms of the agreement." Thus, "[a]n order under the Federal Arbitration Act compelling a party to arbitrate is simply an order granting specific performance of an arbitration provision * * *." Necchi S. P. A. v. Necchi Sewing Mach. Sales Corp., *supra*, 348 F.2d at 696. For this reason, we cannot accept Bethlehem's argument that cases arising under the Federal Arbitration Act are inapposite.

51. Crown Coat Front Co. v. United States, *supra* note 12, 386 U.S. at 511–512, 513–514, 87 S.Ct. 1177; United States v. Anthony Grace & Sons, Inc., *supra* note 40, 384 U.S. at 428–429, 86 S.Ct. 1539; United States v. Joseph A. Holpuch Co., *supra* note 40, 328 U.S. at 239–240, 66 S.Ct. 1000; United States v. Blair, *supra* note 40, 321 U.S. at 735, 64 S.Ct. 820. And "in the absence of some clear evidence that the [administrative] procedure is inadequate or unavailable, that procedure must be pursued and exhausted before a contractor can be heard to complain in a court." United States v. Joseph A. Holpuch Co., *supra* note 40, 328 U.S. at 240, 66 S.Ct. at 1003. See also Crown Coat Front Co. v. United States, *supra* note 12, 386 U.S. at 512, 87 S.Ct. 1177; United States v. Anthony Grace & Sons, Inc., *supra* note 40, 384 U.S. at 429–430, 86 S.Ct. 1539; United States v. Blair, *supra* note 40, 321 U.S. at 736–737, 64 S.Ct. 820.

Pre-eminently, this policy is grounded on a respect for the parties' rights to contract and to provide for their own remedies. * * * But, beyond that, there is also a belief that resort to administrative procedures is an expeditious way to settle disputes, conducive to speed and economy. * * * Such procedures also facilitate a department's supervisory control over contracting officers and perhaps enhance the possibility of harmonious agreement. * * * Further, reliance upon a few expert agencies to make the records and initially to pass on the merits of the claims properly presented to them will lead to greater uniformity in the important business of fairly intrepreting government contracts.[52]

The Maritime Administration's *pro forma* contract is an important cog in the statutory machinery sustaining the vitality of the Nation's shipbuilding industry through governmental participation in the construction of commercial vessels in American shipyards.[53] The Administration drafted the contract as an industry-wide document through utilization of which the Administration might regulate the contractual relations of shipowners and shipbuilders. Not only is the Administration uniquely qualified to interpret the contractual language, but also to maintain nationwide uniformity in construction of its provisions, including the disputes and guaranty clauses. And not the least of the values derivable from the Administration's role as prime interpreter of the contract are to be found in the resultant implications for the agency's overall responsibility for national maritime policy.

Within the banana reefer dispute lurk a number of complicated, technical factual issues. On their resolution turns the jurisdictional question in this litigation, and from an administrative unraveling of the facts judicial adjustment of Grace's claim, if it comes to that, could be greatly facilitated. We have recognized the contributions that administrative ventilation of factual issues can make to judicial definition and adjudication of legal questions,[54] and it seems to us that the District Court could benefit greatly from assistance of that type in connection with the legal and whatever factual questions it may be summoned to decide.

The judicial function in contract disputes, confirmed by the Wunderlich Act,[55] is "an extremely limited review of the administrative decision."[56] If it should be ascertained that the Maritime Administration has jurisdiction over the reefer dispute, the District Court would be confined to such a review. If prior to the jurisdictional determination there is resort to the administrative process, the factual findings eventuating might command the respect that Congress has said they can have. Moreover, in the event of a determination in favor of adminis-

52. United States v. Anthony Grace & Sons, Inc., *supra* note 40, 384 U.S. at 429, 86 S.Ct. at 1542 [citation and footnote omitted].

53. See note 3, *supra.*

54. Smith v. Board of Comm'rs, 127 U.S. App.D.C. 85, 89, 380 F.2d 632, 636 (1967).

55. "No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless the same is fraudulent [*sic*] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." 41 U.S.C. § 321 (1964). The Act also provides that "[n]o Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board." 41 U.S.C. § 322 (1964).

56. United States v. Carlo Bianchi & Co., 373 U.S. 709, 713, 83 S.Ct. 1409, 1412, 10 L.Ed.2d 652 (1963).

trative jurisdiction, only one evidentiary proceeding becomes necessary [57]—the administrative proceeding already conducted. And if the judicial decision should be against administrative jurisdiction, the administrative findings would still serve a useful purpose as expert recommendations to the court. But if, on the other hand, the court should initially make the factual inquiries and then discover jurisdiction in the Maritime Administration, all the effort and expense incidental to that approach would go for naught.

That the District Court possesses equitable power to indulge such a reference cannot be doubted. Judicial and administrative agencies "are to be deemed collaborative instrumentalities of justice." [58] Courts have frequently called upon administrative bodies, in circumstances not significantly variant from those presented here, for assistance in connection with issues falling within an area of administrative competence. [59] A striking analogy, if one is needed, is the doctrine of primary jurisdiction, to which the procedure under consideration bears a close resemblance. [60]

That it has not yet been determined whether the authority to decide the reefer dispute resides in the Maritime Administration or in the District Court is not a barrier to a reference. Again analogizing the doctrine of primary jurisdiction, [61]

\* \* \* in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been ap-

---

57. See United States v. Anthony Grace & Sons, Inc., *supra* note 40, 384 U.S. at 431 n. 8, 86 S.Ct. 1539 and cases there cited.

58. United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 1005, 85 L.Ed. 1429 (1941). See also United States v. Ruzicka, 329 U.S. 287, 295, 67 S.Ct. 207, 91 L.Ed. 290 (1946); S.S.W., Inc. v. Air Transport Ass'n, 89 U.S.App.D.C. 273, 280, 191 F.2d 658, 664 (1951), cert. denied 343 U.S. 955, 72 S.Ct. 1049, 96 L.Ed. 1355 (1952).

59. E. g., Order of Ry. Conductors of America v. Pitney, 326 U.S. 561, 567–568, 66 S.Ct. 322, 90 L.Ed. 318 (1946); Atchison, T. & S. F. Ry. Co. v. Aircoach Transp. Ass'n, 102 U.S.App.D.C. 355, 363–364, 253 F.2d 877, 885–886 (1958); Capital Transit Co. v. Safeway Trails, Inc., 92 U.S.App.D.C. 20, 23, 201 F.2d 708, 711 (1953).

60. As explained by a leading authority,
The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court.
The doctrine of primary jurisdiction does not necessarily allocate power between courts and agencies, for it governs only the question whether court or agency will *initially* decide a particular issue, not the question whether court or agency will *finally* decide the issue. \* \* \*
A determination by a court that an agency has primary jurisdiction does not necessarily mean that the court will refrain from deciding the case before it; it may mean only that the court will postpone its action on the case before it until after the agency has made a designated determination.
3 K. Davis, Administrative Law § 19.01, at 3 (1958).

61. We recognize, of course, that the doctrine of primary jurisdiction is applied in situations where some phase of the matter involved in the court action is within the jurisdiction of the administrative agency, and that the question whether the Maritime Administration has any authority respecting the banana reefer dispute is yet unanswered. On the other hand, the case before us is not one in which it is clear that the Administration does not actually have jurisdiction. *Cf.* Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 253–255, 71 S. Ct. 692, 95 L.Ed. 912 (1951). We need not consider whether the doctrine per se is viable on the basis of the Administration's potential jurisdiction since we think the case here is close enough to those to which the doctrine indisputably applies to warrant invocation of the same inequitable powers.

praised by specialized competence serve as a premise for legal consequences to be judicially defined.[62]

Nothing occurs to us as to why that doctrine should not be correspondingly applied here.[63] And since, whatever the Maritime Administration does on the reference, the District Court will have judicial duties to perform, it is proper that its jurisdiction be retained for that purpose.[64]

Promptly after Grace instituted suit in the District Court, Bethlehem submitted the reefer dispute to the Maritime Administration. There it is still pending, and, despite its position on Grace's "open question,"[65] the Administration has indicated its willingness to deal with it. We hold that the District Court should utilize this opportunity for administrative investigation and appraisal of the factual aspects of the reefer problem as a forerunner to its judicial resolution. With the District Court's retention of jurisdiction in the meanwhile, Grace's right to judicial review will be accorded full protection.[66]

The order appealed from, to the extent that it denies a stay of the controversy over capacities of the banana reefers, is reversed and the case is remanded to the District Court for further proceedings consistent with this opinion. The District Court will stay the suit pending consideration of that controversy by the Maritime Administration, which expectably will include, as a threshold matter, inquiry as to whether the guaranty clause contained in the contracts in suit applies to the claimed reefer deficiencies and as to whether the remedy that clause prescribes is feasible and adequate. The Administration's determinations will be subject to consideration by the District Court in accordance with the principles governing judicial review of administrative action. More specifically, the District Court will first ascertain the Administration's jurisdiction under the disputes clause to resolve the reefer controversy and, if as to jurisdiction the Administration is sustained, will then proceed to an appraisal of the administrative decision on the merits. Should the District Court determine that the Administration possessed jurisdiction, its factual determinations will be accorded the finality statutorily prescribed.[67] Should the District Court determine that the Administration lacked jurisdiction, the administrative findings will be advisory only.[68]

So ordered.

62. Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952).

63. The mere fact that the agency lacks authority to grant the relief sought is immaterial. Thompson v. Texas Mexican Ry., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946) ; General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940).

64. Order of Ry. Conductors of America v. Pitney, *supra* note 59, 326 U.S. at 568, 66 S.Ct. 322; Thompson v. Texas Mexican Ry., *supra* note 63, 328 U.S. at 151, 66 S.Ct. 937; General American Tank Car Corp. v. El Dorado Terminal Co., *supra* note 63, 308 U.S. at 433, 60 S.Ct. 325.

65. See the text *supra* at note 7.

66. See Crown Coat Front Co. v. United States, *supra* note 12.

67. See note 55, *supra*.

68. See United States v. Utah Constr. & Mining Co., *supra* note 14, 384 U.S. at 419 n. 15, 86 S.Ct. 1545, 16 L.Ed.2d 642.