## UNITED STATES *v.* JOSEPH A. HOLPUCH CO.

Nos. 696 and 697. Argued May 3, 1946.—Decided May 20, 1946.

*Abraham J. Harris* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Assistant Attorney General Sonnett* and *Paul A. Sweeney.*

No appearance for respondent.

Mr. Justice Murphy delivered the opinion of the Court.

The narrow question here is whether a contractor's failure to exhaust the administrative appeal provisions of a government construction contract bars him from bringing suit in the Court of Claims to recover damages.

Respondent, a building contractor, entered into two contracts [1] with the United States through the War Department in 1933 to construct officers' quarters at Fort Sam Houston, Texas, which were being built as a Federal

---

[1] The contracts here involved were both executed on U. S. Government Form No. P. W. A. 51.

Emergency Administration of Public Works project. Disputes arose as to excavations for footings and as to increased wages ordered to be paid to respondent's bricklayers. Respondent brought suit against the Government on these matters in the Court of Claims, which entered judgments in favor of respondent on both items.[2]

Article 15, which appeared in both contracts, provided: "All labor issues arising under this contract which cannot be satisfactorily adjusted by the contracting officer shall be submitted to the Board of Labor Review. Except as otherwise specifically provided in this contract, all other disputes concerning questions arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor, within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto as to such questions. In the meantime the contractor shall diligently proceed with the work as directed."

The dispute concerning the footing excavations arose out of an apparent inconsistency between certain figures used in the specifications and in the drawings. The specifications estimated that respondent was to excavate to a depth of $37\frac{1}{2}$ feet below the first-floor level of the buildings. The drawings, on the other hand, were found by the Court of Claims to call for excavations to the depth of 33 feet. Additional payments were to be made to respondent for excavations deeper than indicated "on the drawings," while the Government was to receive a credit for excavations of a lesser depth. Respondent made vari-

---

[2] The Court of Claims entered separate judgments and opinions in relation to each of the two contracts, although both of them were identical and involved the same issues. The only difference between the contracts concerned the particular buildings to be constructed.

ous excavations ranging in depth from 27.58 feet to 42.42 feet. The problem thus presented itself as to whether the 37½-foot figure in the specifications or the 33-foot figure in the drawings should serve as the basis for extra compensation to the respondent and for credit to the Government.

Article 2 of the contracts provided: "In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures or drawings, the matter shall be immediately submitted to the contracting officer . . ." The specifications contained a similar provision and added that the constructing quartermaster was to be the interpreter of the "intent and meaning of the drawings and specifications." The constructing quartermaster duly resolved the discrepancy in this instance by interpreting the specifications and drawings to mean that the footing excavations were to be paid for on the basis of the 37½ feet estimated in the specifications. Respondent made no attempt to appeal from this decision to the contracting officer or to the departmental head in accordance with the terms of Article 15.

The other dispute concerned a required increase in wages for respondent's bricklayers. The contracts established $1.00 per hour as the minimum wage rate for skilled labor unless, as of April 30, 1933, there should be a higher prevailing hourly rate prescribed by collective agreements between employers and employees. Article 18 (e) provided that this minimum wage rate "shall be subject to change by the Federal Emergency Administration of Public Works on recommendation of the Board of Labor Review," in which case "the contract price shall be adjusted accordingly." On March 3, 1934, the Board of Labor Review ruled that bricklayers on another Army construction project at San Antonio, Texas, with which respond-

ent was unconnected, should be paid at the rate of $1.25 per hour retroactive to February 2, 1934. Respondent was informed of this decision and on March 23, 1934, the constructing quartermaster advised respondent that all bricklayers employed on the instant project "will be paid at the rate of $1.25 per hour." Respondent stated that it "would be governed accordingly but under protest, and [that it] expected reimbursement of the difference of 25 . cents per hour." On May 12, 1934, the constructing quartermaster advised respondent "that it was the decision of the contracting officer that bricklayers employed on War Department construction projects at San Antonio, Texas, and vicinity [Fort Sam Houston is in this vicinity] should be paid $1.25 per hour, retroactive to February 2, 1934," and that respondent would be within its rights "to file appeal with the Board of Labor Review from the decision of the contracting officer." [3] No such appeal was taken; respondent merely paid its bricklayers $1.25 per hour and then filed a claim in the court below for the 25-cent differential. Here again the provisions of Article 15 were ignored.

We cannot sanction respondent's failure to abide by the appeal provisions of Article 15 of the contracts which it made with the United States. Both the dispute over the

---

[3] The constructing quartermaster was in error in stating that respondent could have appealed the wage increase decision to the Board of Labor Review. Under Article 15, the Board is charged with handling appeals only on matters involving "labor issues." This plainly means labor issues between employers and employees. See *Blair* v. *United States,* 99 Ct. Cls. 71, 149–150, reversed in other respects, 321 U. S. 730. Here, however, the only controversy lay between the respondent and the Government rather than between respondent and its bricklayers. Hence the ordinary review provisions of Article 15 were applicable, enabling respondent to appeal the contracting officer's decision to the departmental head or his representative. The Court of Claims made a like error in this respect.

footing excavations and the dispute over the bricklayers' wages were "questions arising under this contract" within the meaning of Article 15. The first was a question arising under Article 2 of the contracts as well as under the specifications, which expressly contemplated that government officers would resolve all discrepancies between specifications and drawings. Their decisions in such matters were clearly appealable under Article 15. The second dispute was a question arising under the wage provisions of Article 18 of the contracts; that question involved a consideration of the factual situation surrounding the required wage increase and a determination of the validity and effect of the increase under the circumstances. Any decision or order of a subordinate government officer in this respect was also appealable under Article 15. Yet respondent did not even seek the contracting officer's opinion as to the footing excavation decision of the constructing quartermaster. And as to the contracting officer's order requiring an increase in the bricklayers' wages, respondent neglected to file a written appeal to the departmental head or his representative.

But Article 15 is something more than a dead letter to be revived only at the convenience or discretion of the contractor. It is a clear, unambiguous provision applicable at all times and binding on all parties to the contract. No court is justified in disregarding its letter or spirit. Article 15 is controlling as to all disputes "concerning questions arising under this contract" unless otherwise specified in the contract. It creates a mechanism whereby adjustments may be made and errors corrected on an administrative level, thereby permitting the Government to mitigate or avoid large damage claims that might otherwise be created. *United States* v. *Blair*, 321 U. S. 730, 735. This mechanism, moreover, is exclusive in nature. Solely through its operation may claims be made and adjudicated

as to matters arising under the contract. *United States* v. *Blair, supra,* 735; *United States* v. *Callahan Walker Co.,* 317 U. S. 56, 61. And in the absence of some clear evidence that the appeal procedure is inadequate or unavailable, that procedure must be pursued and exhausted before a contractor can be heard to complain in a court.

It follows that when a contractor chooses without due cause to ignore the provisions of Article 15 he destroys his right to sue for damages in the Court of Claims. That court is then obliged to outlaw his claims, whatever may be their equity. To do otherwise is to rewrite the contract.

In this instance no justifiable excuse is apparent for respondent's failure to exhaust the appeal provisions of Article 15. Certainly the reasons relied upon by the Court of Claims are lacking in merit. The court felt that the dispute over the footing excavation figures involved only a matter of contract price computation and that the responsibility for such a computation rested solely with the Army Finance Officer at Fort Sam Houston, any decision by the contracting officer on the matter being no more than advisory. Since the contracts made no provision for an appeal of the Finance Officer's computation, the Court of Claims held that there was no appealable decision confronting respondent and that respondent's claim could be heard and determined by that court. Support for this novel interpretation was sought in the statement on the covers of the contracts that payment on the contracts was to be made "by the Finance Officer, U. S. Army, Fort Sam Houston, Texas." The short answer is that this designation of a disbursing officer is not a part of the contracts and cannot be used in any way to alter or amend any actual provisions thereof. The designation only identifies the person whose duty it is to perform the ministerial

function of disbursement and is subject to change at any time by the War Department without notice to the contractor.[4] Moreover, even if it be assumed that the issue did concern only the amount of payment under the contracts,[5] such an issue is a question arising under the contracts and hence expressly subject to the provisions of Article 15.

---

[4] The Government points out that in 1933 and 1934 there were 18 Army Finance Officers located at various places in the United States and that all the notation on the cover could mean was that payment was to be made by the Finance Officer at Fort Sam Houston, Texas, and not by a Finance Officer located elsewhere.

Moreover, an affidavit by the Chief, Receipts and Disbursements Division, Office of the Fiscal Director, Army Service Forces, appearing as an appendix to the Government's brief, states in regard to the notation: "This is merely an indication to the constructing quartermaster to which disbursing officer the constructing quartermaster should certify vouchers. The designation of the Finance Officer is not a term of the contract. It is part of an outline showing the parties, the amount, the site of the work, the services to be performed, and the authorized accounts to which payments will be charged. . . . On a construction contract containing the above terms the disbursing officer would not in practice alter or modify and would not be authorized to alter or modify the decision of a certifying construction quartermaster as to the basis on which payments can be made under the contract when such basis, as here, is dependent upon an interpretation of the specifications or has been covered by a decision on a dispute by the contracting officer. . . . Another reason why the Finance Officer would not undertake to determine the question presented in this case is that finance officers as a rule have no experience with construction and would not be qualified to make such decisions."

[5] Such an assumption is faulty in that nearly every dispute between a contractor and the Government ultimately involves the amount of payment under the contract. Hence, under the view of the Court of Claims, all such disputes would be subject to the Finance Officer's review, thereby nullifying Article 15 as well as other portions of the contract contemplating final decision by the contracting officer or the departmental head on these matters.

The Court of Claims sought to justify respondent's refusal to appeal the contracting officer's decision to increase the bricklayers' wages by holding that this decision automatically increased the contract price under the terms of Article 18 (e). It stated that the constructing quartermaster reasonably construed the ruling of the Board of Labor Review in regard to the San Antonio project as applicable to the vicinity of San Antonio as well, the wages prevailing in the vicinity being the wages to apply to a contract within that vicinity. Thus it was said that it was plainly of no special interest to respondent to appeal the contracting officer's decision. But the assumption that this decision automatically resulted in a contract price increase is not in accord with the facts or with the contract provisions. Under Article 18 (e) no automatic price increase results unless the wage change is established by the Federal Emergency Administration of Public Works on recommendation of the Board of Labor Review.[6] The Board alone cannot effect a change; it can only make a recommendation. Here, however, there was no evidence that the wage increase either as to respondent or as to the San Antonio project was established by the Federal Emergency Administration of Public Works, the only agency that had authority to do so. Accordingly the provision of Article 18 (e) for an automatic price increase did not come into operation, as was recognized by respondent in its protest. Serious questions were thus raised as to the authority of the contracting officer to direct a wage increase under these circumstances and as to the validity

---

[6] The Board of Labor Review, although a part of the Federal Emergency Administration of Public Works, is a distinct entity. And Article 18 (e) of the contracts made a clear functional distinction between the two in regard to wage rate increases. We are not free to disregard that distinction and rewrite the procedure established by Article 18 (e).

and effect of the ruling of the Board of Labor Review. Respondent should have secured a determination of those questions by challenging the contracting officer's decision pursuant to the provisions of Article 15.

Respondent having failed to avail itself of the procedure created by Article 15 for the settlement of disputes arising under the contracts, it was precluded from bringing suit on such matters in the Court of Claims. And the Court of Claims erred in entertaining and deciding the claims involving those disputes.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

MR. JUSTICE DOUGLAS, dissenting in part.

The Court requires this contractor to pay out of his own pocket the wage increase which he was directed to make. Whatever support that conclusion may have in a literal reading of the contract, it is so harsh and unfair as to be avoided if the contract does not compel the result. I do not think it does.

The contract set a minimum wage rate of $1 an hour for bricklayers. But it also provided that if the "prevailing" hourly rates under agreements between organized labor and employers on April 30, 1933, were above that minimum rate, the higher rate would become the minimum and be paid.[1] The Federal Emergency Administration of Public Works on recommendation of the Board

---

[1] "In the event that the prevailing hourly rates prescribed under collective agreements or understandings between organized labor and employers on April 30, 1933, shall be above the minimum rates specified above, such agreed wage rates shall apply: *Provided,* That such agreed wage rates shall be effective for the period of this contract, but not to exceed 12 months from the date of the contract."

of Labor Review could change the contract rate of $1 an hour; it could also change the "prevailing" hourly rate. If it did either, it would establish a "different" minimum wage rate within the meaning of the contract.[2] And the contract price would be adjusted accordingly.

The Board of Labor Review, acting for the Federal Emergency Administration of Public Works,[3] ruled that bricklayers on another government project at San Antonio should be paid at the rate of $1.25 an hour. San Antonio, as held by the Court of Claims, is in the same vicinity as Fort Sam Houston where the present projects were under way. And plainly the "prevailing" hourly rate refers to the rate which obtains in the vicinity.

So the respondent paid the extra wages under a ruling which, as I read the contract, was binding on him. It seems, therefore, manifestly unfair to hold that he must pay the wage increase out of his own pocket.

A contractor confronted with an order of the quartermaster to raise the wages of his employees is in an ex-

---

[2] "The minimum wage rates herein established shall be subject to change by the Federal Emergency Administration of Public Works on recommendation of the Board of Labor Review. In event that the Federal Emergency Administration of Public Works acting on such recommendation establishes different minimum wage rates, the contract price shall be adjusted accordingly on the basis of all actual labor costs on the project to the contractor, whether under this contract or any subcontract."

[3] The suggestion that the wage increase at San Antonio was not authorized by the Federal Emergency Administration of Public Works is not warranted by the record. The Board of Labor Review is a part of the Federal Emergency Administration of Public Works. It did not "recommend" an increase at San Antonio. It "formally ruled" that the bricklayers on that project "should be paid at the rate of $1.25 per hour." The Court of Claims treated that as action by the Federal Emergency Administration of Public Works. That seems to me to be the fair construction; and it was so treated both by the quartermaster and the contractor.

tremely difficult position. If he disobeys the order, he risks a strike and industrial turmoil. Yet the Court holds that he must take that risk or else pay the wage increase from his own pocket. Such a literal reading of the contract is not a fair one. And it is not a necessary one, as I have shown. Hence I would choose a construction which avoided that harsh and unfair result and did not victimize the contractor. If he had not protested the order of the quartermaster but had acquiesced, I suppose no one would say that there had been a dispute "concerning questions arising under" the contract,[4] which should have been or could have been appealed. It is not doubted that then the contractor would be entitled to reimbursement. I see no difference in substance if the contractor, after an initial protest, acquiesces in the ruling and accepts the new "prevailing" rate and thus avoids dissension with his employees.

There is justice in what the Court of Claims ruled and I would sustain it.

MR. JUSTICE FRANKFURTER and MR. JUSTICE RUTLEDGE join in this dissent.

---

[4] The Government concedes that the quartermaster's advice to respondent that he could file an appeal with the Board of Labor Review was erroneous. It points out that the Board of Labor Review was charged with the decision only of "labor issues," which embrace controversies between employers and employees. The confusion existing in the mind of the Government's own representative emphasizes the trap set for this contractor whether he followed the quartermaster's suggestion or acquiesced in his ruling.