**DISTRICT OF COLUMBIA, Appellant,**

v.

**SAVOY CONSTRUCTION COMPANY, INC., Appellee.**

No. 82–1350.

District of Columbia Court of Appeals.

Argued Sept. 26, 1984.
Decided Sept. 26, 1986.

Edward E. Schwab, Asst. Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel, at the time briefs were filed, John H. Suda, Principal Deputy Corp. Counsel, at the time briefs were filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C. were on briefs, for appellant.

Jack Rephan, with whom John R. Heisse, II, Washington, D.C. was on brief, for appellee.

Before MACK, NEWMAN and BELSON, Associate Judges.

BELSON, Associate Judge:

This is an appeal from a substantial jury verdict rendered to appellee Savoy Construction Co., Inc. in its action alleging that appellant District of Columbia breached a construction contract. The District assigns as error the trial court's refusal to stay its proceedings or to dismiss the action pending Savoy's exhaustion of administrative remedies, and the court's denial of the District's motion for directed verdict. We affirm.

I

The circumstances giving rise to this case began in 1973. On March 5 of that year, the District of Columbia awarded Savoy Construction Co., Inc. (Savoy) a contract for construction of the Shaw Junior High School replacement. The contract called for the erection of five buildings and for preparation of the site through landscaping and other related work. According to the terms of the contract, Savoy was to perform the work in three phases with a completion date of November 15, 1975. The contract price was $8,314,500, adjusted by numerous change orders to $8,756,-261.12.

Delays ensued in completing all three phases of the contract. The completion date of Phase I and Phase II was extended from June 1, 1975, to December 29, 1975. Savoy did not substantially complete those phases until August 16, 1976. Although Phase III was substantially completed by the adjusted date of August 26, 1976, Savoy never fully executed its work under the contract. On April 12, 1979, the Contracting Officer from the D.C. Department of General Services terminated the contract on the ground that Savoy had defaulted by failing to correct numerous deficiencies in its work noted on a series of "punch

lists." [1] The Contracting Officer eventually assessed $179,092 against Savoy as the amount it cost the District of Columbia to complete the work under the terminated contract.

Savoy submitted to the Contracting Officer a request for an equitable adjustment of $4,564,761 in the contract price necessitated by delays allegedly caused by the District. The Contracting Officer denied the claim. He determined that Savoy, rather than the District, was responsible for the delays Savoy experienced in excess of the time extensions granted for completion of Phase I and Phase II. The Contracting Officer assessed liquidated damages against Savoy in the sum of $270,200 for the delays he adjudged the contractor had caused.

Pursuant to the disputes clause of the contract [2] Savoy appealed the decisions of the Contracting Officer to the District of Columbia Contract Appeals Board. The appeals challenged the termination of the contract for default, the assessment of the $179,092 that the District spent to complete the work under the contract, and the assessment of $270,200 in liquidated damages for the delays in Phase I and Phase II.

While those appeals were pending, Savoy also filed this action in Superior Court seeking damages of $4,564,761.23 for delays allegedly caused by the District. In its complaint, Savoy asserted that the District breached the contract in five ways: (1) the plans and specifications furnished by the District contained numerous material errors, omissions and defects in design; (2) the District failed to resolve these problems within a reasonable time after the inadequacies became evident; (3) the District failed to maintain and update the construction schedule; (4) the District denied Savoy access to certain work areas on the

dates the parties had agreed access was to be provided; and (5) the District failed to issue a comprehensive final punch list in a timely manner. A sixth breach claim—failure to make timely progress payments— was added in Savoy's pretrial statement.

The District of Columbia filed a pretrial motion for summary judgment or, alternatively, for a stay of the proceedings on the ground that Savoy had not exhausted its contractually established administrative remedies. After a hearing, Judge Bacon denied the motion. The District appealed the order to this court and soon thereafter moved the Superior Court for a stay of proceedings pending our resolution of its appeal. Judge Bacon denied the motion for a stay. The District filed another such motion with this court and it too was denied.

The case proceeded to a jury trial before Judge Braman. Savoy required nearly eight full days to present its case. Following the testimony of Savoy's several witnesses, the trial court denied the District's renewed motion for judgment on the issue of exhaustion of administrative remedies, but granted the District a directed verdict on four of the six breach claims asserted by Savoy. The two that remained related to the alleged defects in the contract drawings and specifications and the District's alleged tardiness in correcting the defects.

The jury rendered a verdict of $977,-635.42 to Savoy and its subcontractors. The trial judge denied the District's motion for judgment notwithstanding the verdict or, alternatively, for a new trial. This appeal followed.

## II

The District of Columbia contends that the trial court erred in refusing to dismiss

1. A punch list enumerates what the District has determined to be instances of defective workmanship or latent deficiencies.

2. Article 15: Disputes.—Except as otherwise specifically provided in this contract, all disputes concerning questions arising under this

contract shall be decided by the Contracting Officer subject to written appeal by the contractor within thirty (30) days to the Contract Appeals Board, whose decision shall be final subject to such limitations and review as may be provided by law.

or stay this action pending Savoy's exhaustion of its contractually-established administrative remedy. Proper analysis of the District's argument requires an examination of the legal context in which it is made.

The particular construction contract between the government and a private contractor is always "the constitution governing the mode of resolving the parties' disputes." *Len Co. v. United States*, 385 F.2d 438, 441, 181 Ct.Cl. 29 (1967). There is a fundamental distinction between claims which, by virtue of an agreement by the parties—as embodied in their contract—are subject to resolution by an administrative agency, and those claims which, because they have not been made determinable under the contract, remain "pure" breach of contract claims that may be tried de novo in court. *Jefferson Construction Co. v. United States*, 392 F.2d 1006, 1010, 183 Ct.Cl. 720, *cert. denied*, 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968). The disputes clause of the contract operates to distinguish claims that are to be disposed

of administratively from those that may be adjudicated judicially. *See United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 404, 86 S.Ct. 1545, 1551, 16 L.Ed.2d 642 (1966).

 The disputes clause in the instant contract requires that "all disputes· concerning questions arising under this contract" must be decided by the Contracting Officer, with the right of appeal within thirty days to the Contract Appeals Board, the decision of which shall be final "subject to such limitations and review as may be provided by law." Quoted in full *supra* note 2. The disputes clause is interpreted narrowly. *Utah*, 384 U.S. at 417, 86 S.Ct. 1557 (construing the substantially similar language used in the standard federal government construction contract). It applies not to all claims "relating to" the contract, *id.* at 418, 86 S.Ct. at 1558, but rather only to claims "arising under" the contract.[3] The "arising under" claims subject to administrative determination are those claims asserted under other clauses

---

**3.** With respect to claims "arising under" the contract and therefore subject only to administrative, not judicial, determination in the first instance, the contractor has the right to resort to the courts only upon the making of that administrative determination. *Crown Coat Front Co. v. United States*, 386 U.S. 503, 511–12, 87 S.Ct. 1177, 1181–82, 18 L.Ed.2d 256 (1967). The Supreme Court in *Crown* elaborated on the operation of the disputes clause:

> It is now crystal clear that the contractor must seek the relief provided for under the contract or be barred from any relief in the courts.... [T]he disputes clause
> "is a clear, unambiguous provision applicable at all times and binding on all parties to the contract. No court is justified in disregarding its letter or spirit.... It creates a mechanism whereby adjustments may be made and errors corrected on an administrative level, thereby permitting the Government to mitigate or avoid large damage claims that might otherwise be created. This mechanism, moreover, is exclusive in nature. Solely through its operation may claims be made and adjudicated as to matters arising under the contract.... And in the absence of some clear evidence that the appeal procedure is inadequate or unavailable, that procedure must be pursued and exhausted before a contractor can be heard to complain ·in a court."

[*United States v. Joseph A. Holpuch Co.*, ] 328 U.S. 234, 239–40, 66 S.Ct. 1000, 1003, 90 L.Ed. 1192 [ (1946) ]....

Even when the contractual scheme has run its course and the contractor is free to file his suit in court, he is not entitled to demand a *de novo* determination of his claim for an equitable adjustment. The evidence in support of his case must have been presented administratively and the record there made will be the record before the reviewing ᴄourt. The court performs principally a reviewing function. Only if it is alleged and proved that the administrative determination was arbitrary, capricious, or not supported by substantial evidence may the court refuse to honor it. This much is clear not only from the disputes clause itself but from the Wunderlich Act. [41 U.S.C. §§ 321–22.]

386 U.S. at 512–13, 87 S.Ct. at 1182–83 (citations and footnote omitted); *see also United States v. Grace & Sons, Inc.*, 384 U.S. 424, 428–29, 86 S.Ct. 1539, 1542, 16 L.Ed.2d 662 (1966) (discussing policy that requires utilization of administrative procedures contractually bargained for).

This court applies the Wunderlich Act standards of *judicial review to factual determinations* by the District of Columbia Contract Appeals Board. *District of Columbia v. Heman Ward, Inc.*, 261 A.2d 836, 838 (D.C.1970).

of the contract calling for equitable adjustment of the contract price or an appropriate extension of time, or both, if the government orders permitted changes in the work or if the contractor encounters changed conditions differing materially from those ordinarily anticipated. *Crown Coat Front Co. v. United States,* 386 U.S. 503, 505–06, 87 S.Ct. 1177, 1178–79, 18 L.Ed.2d 256 (1967); *Utah, supra,* 384 U.S. at 403–18, 86 S.Ct. at 1550–58. "When the contract makes provision for equitable adjustment of particular claims, such claims may be regarded as converted from breach of contract claims to claims for relief under the contract." *Utah, supra,* 384 U.S. at 404 n. 6, 86 S.Ct. at 1551 n. 6.[4]

■ Thus, the test to be employed in distinguishing claims "arising under" the contract, and therefore within the disputes clause procedure, from breach of contract claims outside that procedure is whether the controversy is fully redressable under a specific contract adjustment provision other than the disputes clause itself. *Bethlehem Steel Corp. v. Grace Line, Inc.,* 135 U.S.App.D.C. 81, 86, 416 F.2d 1096, 1101 (1969) (citing *Utah, supra,* 384 U.S. at 412–18, 86 S.Ct. at 1555–58; *see Edward R. Marden Corp. v. United States,* 442 F.2d 364, 366–67, 194 Ct.Cl. 799 (1971). "In consequence, claims which are adjustable under contractual provisions must be submitted for the administrative determination prescribed by the contract, while claims for breach of contract—those not adjustable in that fashion—may be litigated in a court of competent jurisdiction without previous resort to that procedure." *Bethlehem, supra,* 135 U.S.App.D.C. at 86, 416 F.2d at 1101.

■ It is also well established that where the government orders a structure to be built, and in so doing prepares the project's plans and specifications prescribing the character, dimension, and location of the construction work, the government impliedly warrants the adequacy of its plans and specifications to the extent that compliance with them will result in satisfactory performance. *E.g., Chaney & James Construction Co. v. United States,* 421 F.2d 728, 731, 190 Ct.Cl. 699 (1970); *Jefferson,* 372 F.2d at 1011; *J.D. Hedin Construction Co. v. United States,* 347 F.2d 235, 241, 171 Ct.Cl. 70 (1965). "This rule rests on the presumed expertise of the government where it sees fit to prescribe detailed specifications." *Hedin, supra,* 347 F.2d at 241 (citations omitted). The rule was first announced by Justice Brandeis in *United States v. Spearin,* 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918), and elaborated by the Court of Claims in *Laburnum Construction Co. v. United States,* 325 F.2d 451, 163 Ct.Cl. 339 (1963), which stated:

If faulty specifications prevent or delay completion of the contract, the contractor is entitled to recover damages for the defendant's breach of its implied warranty. Those damages extend to the costs incurred by reason of the idleness resulting from the mistakes in the plans. The [government] cannot, by errors in the specifications, cause delay in [the contractor's] completion of the work and then compensate [the contractor] merely by extending its performance time and by payment of any added direct cost occasioned by changes to correct those errors.

---

**4.** The parties to a construction contract may choose to disestablish breach of contract claims through the fashioning of additional contract adjustment provisions, such as a "suspension of work" clause, designed to deal with claims for delay damages. *Utah,* 384 U.S. at 415–16, 86 S.Ct. at 1557. *Compare Broome Const., Inc. v. United States,* 492 F.2d 829, 832, 203 Ct.Cl. 521 (1974) (suspension clause specifically prohibited recovery of delay costs), *with Chaney & James*

*Const. Co. v. United States,* 421 F.2d 728, 732, 190 Ct.Cl. 699 (1970) ("since the Suspension of Work clause is an administrative substitute for an action at law for breach ... the contractor should be entitled to get the same relief under the clause that he could get in the absence of the clause if he sued for breach of contract"). The parties in the instant case did not include a suspension clause in their contract.

*Id.* at 457–58 (citations omitted); *see also Chaney, supra,* 421 F.2d at 731; *Hedin, supra,* 347 F.2d at 241.

■ The District of Columbia contends in this case that Savoy's claim for delay damages is redressable under the changes clause, Article 3 of the contract, and therefore is subject to initial administrative resolution as provided in the disputes clause.[5] The changes clause governs the procedure by which the government may alter the specifications of the contract for general causes. It provides for equitable adjustment with respect to the cost of, and time required for, performance of the work changed by the government. It does not allow for recovery, however, of consequential damages for delay incident to the changes. *United States v. Rice,* 317 U.S. 61, 67, 63 S.Ct. 120, 123, 87 L.Ed. 53 (1942).

In support of its argument regarding the applicability of the changes clause, the District alleges that Savoy submitted claims regarding dimensional errors to the Contracting Officer for equitable adjustment under Article 3. We do not know the precise content of those claims, for they have not been made part of the record in this appeal. But even if we were to assume, *arguendo,* that Savoy sought redress under the changes clause, that fact would not

foreclose Savoy from proceeding in court to recover delay damages over and above any equitable adjustment it had received, if the delay was due to the District's deficient specifications.[6] Neither the Contracting Officer, under the changes clause or the disputes clause, nor the Contract Appeals Board, under the disputes clause, has jurisdiction to compensate Savoy for its increased costs resulting from delays caused by the District's faulty plans. The issuance of change orders and the making of equitable adjustments cannot cure what is otherwise a breach of contract. *See Chaney, supra,* 421 F.2d at 732; *Hedin, supra,* 347 F.2d at 241; *Laburnum, supra,* 325 F.2d at 457. In effect, then, with respect to consequential damages caused by deficient specifications, there were no administrative remedies for Savoy to exhaust.[7]

Savoy's claims which survived the District's motions for directed verdict, alleging faulty specifications and failure to act with due alacrity, constitute claims of breach of contract under the rule of *Spearin* and *Laburnum.* Those claims would properly be litigated in court without previous resort to the administrative procedures prescribed by the contract. In court, Savoy was permitted to seek that which it could never obtain administratively: namely, full recov-

---

5. Article 3. Changes.—The Contracting Officer may at any time, by written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of performing the work under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be made in writing to the Contracting Officer within 10 days from the date the change is ordered: *Provided, however,* That the Contracting Officer, if he determines that the facts justify such action, may receive and consider and adjust any such claim made at any time prior to the date of final settlement of this contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. Nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

6. *See, e.g., Kehm Corp. v. United States,* 93 F.Supp. 620, 624–25, 119 Ct.Cl. 454 (1950) (fact that contractor was administratively granted an extension of time needed because of government-imposed delays does not diminish the government's liability for its breach); *George A. Fuller Co. v. United States,* 69 F.Supp. 409, 413, 108 Ct.Cl. 70 (1947) (same).

7. *Cf. Weinberger v. Wiesenfeld,* 420 U.S. 636, 641 n. 8, 95 S.Ct. 1225, n. 8 1230, 43 L.Ed.2d 514 (1975) (reaching merits despite fact that party, challenging constitutionality of provision of Social Security Act discriminating against men, had failed to exhaust administrative remedies; the government stipulated that administrative appeal would have been futile because the provision in question, on its face, precluded granting benefits to men). *See generally* 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 26.11 (2d ed. 1983).

ery of *all* damages it incurred, including delay damages (*e.g.,* excess overhead). *See Chaney, supra,* 421 F.2d at 731; *Luria Brothers & Co. v. United States, supra,* 369 F.2d 701, 708–09, 177 Ct.Cl. 676 (1966); *Laburnum, supra,* 325 F.2d at 457–59.

■ The District argues that the strong policy in favor of administrative resolution of disputes under the contract requires that, when a contractor has claims both under the contract and for breach, the claims under the contract should be resolved administratively even if the result is also to resolve breach claims in that process. For this proposition, the District relies on the Supreme Court opinion in *Utah, supra,* and the opinion of the United States Court of Appeals for the District of Columbia in *Bethlehem, supra,* 135 U.S.App.D.C. 81, 416 F.2d 1096. We proceed to examine those two cases.

In *Utah* the contractor executed a contract to build a facility for the Atomic Energy Commission. After completing the project it filed two claims with the Contracting Officer. One of the claims alleged changed conditions and asked for an adjustment in the contract price and an extension of time. The other claim alleged that the government had furnished inadequate specifications and drawings on account of which the contractor demanded additional compensation and additional time. The Advisory Board of Contract Appeals denied all relief save authorization of a time extension on the second claim. The contractor subsequently sued for breach of contract. The Court of Claims treated the contractor's claims as ones for delay damages alleging a breach of contract by reason of the government's unreasonable delay. It held the Board's administrative findings regarding the responsibility for the delays to be subject to de novo determination in the Court of Claims.

The Supreme Court reversed. It ruled that where a Board of Contract Appeals, pursuant to its authority to consider requests for time extensions under specific contract provisions, makes findings of fact which comply with the Wunderlich Act standards, such findings are conclusive on the parties not only under the contract provisions, but also in a subsequent court action for breach of contract and delay damages. 384 U.S. at 418–19, 86 S.Ct. at 1558. The Court reviewed the language and policies underlying the disputes clause and the Wunderlich Act as well as the general principles of collateral estoppel, and concluded that they require finality of administrative factfinding on questions arising under the contract. *Id.* at 419–22, 86 S.Ct. at 1558–60. As the Court explained:

> It would disregard the parties' agreement to conclude … that because the court suit was one for breach of contract which the administrative agency had no authority to decide, the court need not accept administrative findings which were appropriately made and obviously relevant to another claim within the jurisdiction of the board.

*Id.* at 419, 86 S.Ct. at 1558–59.

We find *Utah* distinguishable from this case.

In *Utah* the contractor had fully exhausted all available administrative procedures before bringing an action in the Court of Claims for breach of contract. The Supreme Court's holding—that the Court of Claims was not at liberty to disregard the administrative findings of fact and to conduct a trial de novo—was premised on the fact that an administrative determination of the facts had already been made at the time the matter came before the Court of Claims. The Court stressed "the finality, in a suit for delay damages, of all valid and appropriate administrative findings *already made* in the course of resolving a dispute 'arising under' the contract." *Utah, supra,* 384 U.S. at 420, 86 S.Ct. at 1559 (emphasis added). Such a result "avoids 'a needless *duplication of evidentiary hearings* and a heavy *additional* burden in the time and expense required to bring litigation to an end,' [*United States v. Carlo Bianchi & Co.,* 373 U.S. 709, 717,

83 S.Ct. 1409, 1414, 10 L.Ed.2d 652 (1963) ], and it encourages the parties to make a complete disclosure at the administrative level, rather than holding evidence back for *subsequent* litigation." *Id.* (citation and footnote omitted) (emphasis added). The Court concluded that, because the Advisory Board of Contract Appeals had conducted a hearing on the contractor's claims and had made relevant factual findings, "both parties *had a full and fair opportunity* to argue their version of the facts and an opportunity to seek court review of any adverse findings. There is, therefore, neither need nor justification for a *second* evidentiary hearing on these matters *already resolved* as between these two parties." *Id.* at 422, 86 S.Ct. at 1560 (emphasis added).

In the instant case, by contrast, the Contract Appeals Board had not adjudicated Savoy's claims when they came before the court. The rationale of *Utah*, therefore, does not apply. Here there was no administrative determination of the facts to which could attach the finality required by the disputes clause, the Wunderlich Act, and general principles of collateral estoppel. Absent such a prior adjudication, there was no risk of "needless duplication of evidentiary hearings" or of the parties shouldering " 'heavy additional burden[s] in the time and expense required to bring litigation to an end.' " *Utah, supra,* 384 U.S. at 420, 86 S.Ct. at 1559 (quoting *Carlo Bianchi,* 373 U.S. at 717, 83 S.Ct. at 1415). The parties had no reason to hold evidence back for "subsequent litigation." *Id.* In short, the evils the Supreme Court was striving to stem in *Utah* do not attend the circumstances in this case.

The *Bethlehem* case, on which the District also relies, involved contracts in which Bethlehem Steel Company agreed to build four ships for Grace Line, Inc. Several disputes arose including one about alleged deficiencies in the size of the ships' refrigerated holds (reefers) for banana cargoes. Grace eventually brought an action against Bethlehem in the district court seeking damages for breach of contract resulting from, *inter alia,* the alleged banana reefer deficiencies. The district court held that Grace's claims of undersized banana reefers were not subject to the disputes clause of the contracts or to the contractually established administrative proceedings before the Maritime Administration. It therefore denied Bethlehem's motion for a stay pending administrative resolution of the reefer controversy.

The circuit court reversed. It assigned the district court the task of ascertaining the applicability to the banana reefer claim of the guaranty clause, the specific contract adjustment provision most relevant to that claim, as well as the task of weighing the effectiveness of the remedial process the clause prescribed. *Bethlehem, supra,* 135 U.S.App.D.C. at 88–91, 416 F.2d at 1103–06. In undertaking the jurisdictional determination whether the authority to decide the reefer dispute resides in the Maritime Administration or in the district court, however, the district court "can and should initially refer the dispute to the Administration, retaining jurisdiction to review its decision and pass final judgment on the matter." *Id.* at 91, 416 F.2d at 1106. That course, according to the circuit court, would comport well with fundamental policy underlying the rule that claims referable under the disputes clause for administrative adjustment require exhaustion of administrative procedures before being entertained judicially. *Id.* at 91–92, 416 F.2d at 1106–07. The court analogized to the doctrine of primary jurisdiction and emphasized the "contributions that administrative ventilation of factual issues can make to judicial definition and adjudication of legal questions...." *Id.* at 92–93, 416 F.2d at 1107–08.

There are, however, important factual differences which distinguish *Bethlehem* from the case at hand. The court there began by reviewing *Utah's* distinction between claims within the disputes clause procedure and those outside that procedure. It stated that a claim "is one 'arising

under this contract' only when the disputed fact is capable of *complete resolution* by a procedure specified in the contract." *Bethlehem, supra,* 135 U.S.App.D.C. at 86, 416 F.2d at 1101 (emphasis added). With reference to the specific disputes clause in the parties' contracts, the court held that it "excludes Grace's banana reefer claim unless it is subject to *full administrative vindication* under some other provision of the contracts." *Id.* at 88, 416 F.2d at 1103 (emphasis added). The court proceeded to examine the guaranty clause and expressed uncertainty as to whether it applied to reefer deficiencies and, if so, whether it provided the means for resolving the controversy concerning them. *Id.* at 88–90, 416 F.2d at 1103–05. Such questions were deemed for the district court to decide. *Id.* at 90–91, 416 F.2d at 1105–06. The circuit court concluded by declaring that the trial court should enlist the aid of the Maritime Administration as a forerunner to its jurisdictional decision. *Id.* at 91–94, 416 F.2d at 1106–09.

We observe that the circuit court's order in *Bethlehem* directing the district court to refer the dispute to the Maritime Administration was predicated on the uncertainty beclouding the question whether the banana reefer dispute was fully redressable under the guaranty clause. In contrast, no such uncertainty hindered or obscured the trial court's jurisdictional determination in this case. Savoy's breach of contract claims, based on the District's allegedly defective specifications and its tardiness in correcting them, clearly were not capable of *complete* resolution under the changes

clause; recovery of delay damages was possible only in court.[8] Unlike the district court in *Bethlehem,* therefore, the trial court here did not need to utilize administrative investigation and appraisal of the factual aspects of the claims as a precursor of its determination of jurisdiction.

The District directs our attention to *Nager Electric Co. v. United States,* 368 F.2d 847, 177 Ct.Cl. 234 (1966), in which the Court of Claims stated that:

where a contractor has both "disputes-clause" items and "breach-type" claims under a single contract, the following standards have controlled in this court: (i) there should be only one suit to enforce the various claim-items; (ii) the contractor *can* bring suit on the ripened "breach-type" items before completion of the administrative process on the "disputes-clause" items, but if he does so he may well lose the latter claims unless he includes them (by proper amendment, if necessary, as they mature) in his court action; *but* (iii) the contractor need not file suit on the "breach-type" items until after the end of the administrative process, when all the items have ripened and can be included in the one petition.

Citing *Zidell Explorations, Inc. v. United States,* 427 F.2d 735, n. 4, 192 Ct.Cl. 331 (1970) and *Cement Brothers Co. v. United States,* 418 F.2d 1356, 1359, 190 Ct.Cl. 50 (1970), the District also informs us that the Court of Claims has adopted a policy of suspending its proceedings on breach of contract actions pending completion of administrative adjudication of claims under

8. In *Rohr Indus., Inc. v. WMATA,* 232 U.S.App. D.C. 92, 96, 720 F.2d 1319, 1323 (1983), the Court of Appeals for the District of Columbia Circuit quoted with approval from *United States v. Medico Indust., Inc.,* 685 F.2d 230, 235 (7th Cir.1982):

As a general rule, ... the Board [of Contract Appeals] should be given an initial opportunity to decide whether the dispute "arises under" the contract.... Only in cases where the question determining jurisdiction can arguably be said to "arise under" the contract can the general principle be properly applied.

In light of *Laburnum* and its progeny, it is now clear beyond cavil that claims, such as Savoy's, for delay damages based on breach of the government's implied warranty of the adequacy of its plans and specifications do not "arise under" the contract. Savoy's claim is "clearly beyond the scope of the [d]isputes clause in the contract," *Rohr,* 232 U.S.App.D.C. at 96, 720 F.2d at 1323, and therefore the Contract Appeals Board need not have been afforded an opportunity initially to decide the jurisdictional question.

the disputes clause.[9] The District urges us to adopt a similar policy for this jurisdiction. Without deciding to adopt such a blanket policy, we observe that considerations of both prudence and judicial economy should suggest to trial judges that they be disposed favorably toward such requests for stay, even where the trial court is reasonably satisfied that it has jurisdiction. As the circuit court pointed out in *Bethlehem*, 416 F.2d at 1107, administrative investigation and appraisal of the factual aspects of the problems can not only facilitate decision on the merits but in some cases may also shed additional light on jurisdictional issues.

Under the circumstances presented here, however, it would be inordinately wasteful to reverse the judgment of the trial court now for failing to await the Contract Appeals Board's resolution of Savoy's non-breach claims because Savoy's breach claims ultimately could have been resolved only by the trial court and not by the Board, in any event.

Accordingly, we find no error in the trial court's refusal to dismiss this case or to stay its proceedings pending the resolution by the Contract Appeals Board of Savoy's claims under the disputes clause.[10]

9. By operation of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (codified in scattered sections of 28 U.S.C.), the Court of Claims has been merged with the Court of Customs and Patent Appeals to create the United States Court of Appeals for the Federal Circuit.

10. We take note of the fact that District of Columbia construction contracts currently contain a changes clause and a suspension of work clause, *see supra* note 4, under which a contractor can recover the consequential costs of delay in an equitable adjustment by means of claims that must be presented for administrative adjudication prior to resort to the courts. The contract clauses now in use are set forth in *Bureau of Materiel Management, District of Columbia Dept. of Gen. Servs., Materiel Management Manual* § 2642.11, which was adopted as a final order on June 15, 1974, 31 D.C.Reg. 2714 (June 1, 1984). *See also* the District of Columbia Procurement Practices Act of 1985, D.C. Act 6–110, 32 D.C.Reg. 7396–7430 (1985), which came into effect as D.C.Law 6–85, 33 D.C.Reg.

## III

■ The trial court permitted two of Savoy's breach of contract claims to go to the jury. One alleged that the contract drawings and specifications furnished by the District of Columbia were defective, the other that the District failed to ameliorate the defects in a timely manner. Savoy's theory regarding the contract drawings and specifications was that they were faulty in two ways: (1) the drawings contained incorrect dimensions for ceiling heights as a result of which not enough room was allowed for installation of pipes, ductwork and electrical fixtures above the ceiling, and (2) the drawings showed incorrect dimensions for the evaluations of so-called "hung plates" (also known as "relieving angles" or "brick spandrels") on which masonry work was placed.[11]

The District argues that Savoy presented insufficient evidence as a matter of law to warrant any consideration of the question whether dimensional errors in the contract drawings and specifications caused the problem with the hung plates. The District maintains that the trial court erred in denying its motion for directed verdict on this point. We disagree.

As this court recently summarized:

1291 (1986) (codified at D.C.Code §§ 1–1181.1 to 1191.2 (1986 Supp.)), § 805(a) of which requires a party contracting with the District to submit for administrative determination all claims "arising under or relating to" the contract. In view of these provisions of the statute and the manual, we anticipate little, if any, repetition before this court of the issue we have addressed here.

11. The five buildings constituting Shaw Junior High School are designed of structural steel with brick walls. Steel columns and beams bear nearly the entire weight of the building. The hung plates are part of the structural steel. They are essentially metal shelves that are hung from the structural steel beams. The exterior brick walls are laid on top of the plates. The plates bear the weight of the walls and transfer that weight to the steel beams and columns of each building.

A large number of the hung plates had to be moved or otherwise altered after the structural steel had been erected. These alterations are what delayed construction.

The law applicable to review of a denial of a motion for directed verdict in this jurisdiction is clear.

> [T]he evidence must be reviewed most favorably to the party against whom the motion is made, and that party must be given the benefit of all reasonable inferences from the evidence.

This standard of review on appeal is identical to the standard applied by the trial court. With the evidence viewed in this manner, a verdict will be directed only when the evidence is so clear that reasonable men could reach but one opinion. In so viewing the evidence, the court "must take care to avoid weighing the evidence, passing on the credibility of witnesses or substituting its judgment for that of the jury." If reasonable men could differ on the outcome of the case, it must be sent to the jury.

*Vuitch v. Furr*, 482 A.2d 811, 813–14 (D.C. 1984) (citations omitted).

■ Viewing the evidence adduced at trial most favorably to Savoy, we find sufficient evidence to support an inference that the District of Columbia breached its contract by providing contract drawings and specifications that contained dimensional error relating to the hung plates.[12]

We highlight a few items of such evidence. Edward J. McLaughlin, a witness introduced by Savoy, had a Master of Science Degree in civil engineering and was a registered professional engineer. He worked for Savoy on the Shaw Junior High School project first as a trouble-shooter and then as a job site superintendent. At trial he testified about the nature of the problem with the hung plates and its cause. According to McLaughlin, the coursing of the brickwork on some of the hung plates did not come up to the elevation of the top of the hung plates. The resulting gap could not be adjusted because the hung plates were welded to the structural steel members. In McLaughlin's view, the brick had been run correctly; the problem was that the hung plates did not meet the brick.

McLaughlin spent several weeks researching the problem to determine precisely from where the elevations for the hung plates had come. He concluded that the designer, employed by the District of Columbia, had established the elevations. In some instances, the elevations were included among the dimensions in the contract drawings furnished by the District. In other instances, the elevations were added by the designer to the shop drawings which were prepared by Savoy's detailer[13] on the basis of the contract drawings and then submitted to the designer for his review and approval. McLaughlin added, in response to a hypothetical question, that a detailer could not readily recognize as erroneous a dimension specified in the contract drawings. In this case, McLaughlin felt that the detailer had performed satisfactorily.

To the same effect was the testimony of Stephen Zeiba, who had been employed by Savoy as project manager for the Shaw Junior High School. He described the problem with the hung plates much as did McLaughlin and attributed the problem to errors in the District's contract drawings. Lending support to Zeiba's testimony was

---

12. We reject the District's contention that it was incumbent on Savoy to support its theory of liability by pointing directly to specific dimensional errors in the contract drawings. A party may satisfy its burden of producing evidence by offering circumstantial evidence, as did Savoy. *See generally* McCormick on Evidence § 337 (E. Cleary 3d ed. 1984). Furthermore the District fails to persuade us that Savoy was required to elicit expert testimony to assist the jury in reviewing the contract drawings and specifications. Much of the testimony at trial came from persons with considerable training and experience in construction matters who also had firsthand knowledge of the facts in dispute here. What incremental assistance expert testimony would have provided the jury in wending its way through some of the technical complexities of this case was not of sufficient magnitude to constrain us to rule that the trial court erred in submitting this case to the jury without such assistance.

13. A detailer is employed by a contractor to elaborate upon plans and specifications by rendering detailed shop drawings.

documentary evidence consisting of letters he had written to the District of Columbia Bureau of Construction Management referring to the fact that the District's architect had requested dimensional changes for the hung plates. Gerald E. Carpenter, an inspector at the Shaw Junior High School for the D.C. Department of General Services, testified that many change orders were issued by the District to correct errors on the drawings.

James R. Harris, Jr. was called by the District of Columbia to testify at trial. He had been chief of construction for the Bureau of Construction Management at the time of the Shaw Junior High School project. He discussed an agreement between Savoy and the District which provided that "the contract[or] would correct various and all relieving [*i.e.* hung] plates to accommodate the masonry and the contractor would be reimbursed by the District Government for those plates found to be [in] error caused by the Government and the contractor would correct at his expense the plates that were improperly fabricated or erected on the job." Harris testified that the District had, in fact, reimbursed Savoy for some of the work of correcting the hung plates. With reference to a letter he had written to Savoy stating that "[t]he dimensional problems regarding the brick spandrels [*i.e.*, the hung plates] ... were resolved," Harris testified, "[e]vidently there were some errors there which were possibly the fault of the contract ..., the District's contract."

Viewing the evidence in the light most favorable to Savoy, we conclude that the trial court did not err in submitting this case to the jury.

*Affirmed.*

MACK, Associate Judge, dissenting:

This is *not* a breach of contract case. This is a dispute arising under a contract—a dispute which, by agreement of the parties, is subject to resolution by an administrative agency in the first instance. I would have thought the governing principles of administrative exhaustion, under these circumstances, to be so well established by case law as to admit of little contest. *See United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Bethlehem Steel Corp. v. Grace Line, Inc.,* 135 U.S.App.D.C. 81, 416 F.2d 1096 (1969); *see also Jefferson Construction Co. v. United States,* 183 Ct.Cl. 720, 392 F.2d 1006, *cert. denied,* 393 U.S. 842, 89 S.Ct. 122, 21 L.Ed.2d 113 (1968). The majority pays lip service to these principles before proceeding, tortuously, to explain why the cases do not apply. The truth is that the rationale of these cases cannot be distinguished.

Here, Savoy Construction Company and the District of Columbia, by virtue of Article 3 of a contract, have agreed that *all* claims of deficient plans or specifications are subject to equitable adjustment under the contract.[1] Yet this court, by characterizing Savoy's claim against the District as one for "consequential damages for delay incident to the [District's] changes [of specifications]," seeks to justify the contractor's unilateral recasting of an administrative dispute into a breach of contract mold cognizable de novo in the judicial system.

1. Article 3 provides, in relevant part:

 Changes.—The Contracting Officer may at any time ... make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in *the cost of performing the work* under this contract, or in *the time required for its performance,* an equitable adjustment shall be made and the contract shall be modified in writing accordingly.... If the parties fail to agree upon the adjustment to be made *the dispute shall be determined as provided in Article 15 hereof.* [Emphasis added.]

 Article 15 provides:

 Disputes.—Except as otherwise specifically provided in this contract, *all* disputes concerning questions arising under this contract shall be decided by the Contracting Officer subject to written appeal by the contractor within thirty (30) days to the Contract Appeals Board, whose decision shall be final subject to such limitations and review as may be provided by law. [Emphasis added.]

This exercise in semantics should not be countenanced; even if the contract provisions do permit a claim for consequential damages, *see United States v. Rice,* 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), it is one which Savoy has agreed to put before the Contract Appeals Board and not before a jury, *see supra* note 1. The matter is all the more disturbing since the majority, in prematurely permitting Savoy to recover damages "over and above any equitable adjustment it had received" admits to not knowing the precise nature of the administrative claims submitted for equitable adjustment.

It is interesting to note how the majority distinguishes the Supreme Court decision in *United States v. Utah Construction & Mining Co., supra* —a decision which, although arising in the context of finality of determination, holds that by virtue of the disputes clause of a contract (and the Wunderlich Act), administrative findings are appropriately made on *all factual issues relevant* to questions arising under the contract, *including those for breach of contract.*[2] *See* 384 U.S. 419–20, 86 S.Ct. at 1558–59. The majority says *Utah* is not controlling here because in *Utah* the contractor (in accord with his agreement) had fully exhausted all administrative procedures before coming to court. But that is precisely why *Utah* does control! Is the majority saying that Savoy, having violated its agreement to exhaust administrative procedures before coming to court, was not bound to submit all factual issues relevant to questions arising under the contract to the administrative agency? Is it saying that Savoy's breach of contract relieved it from compliance with the contract? Is the majority saying that damages for delay *incident* to changes of specifications are not *relevant* to changes of specifications?

It is likewise interesting to note the treatment afforded by the majority to the 1969 federal circuit court decision in *Bethlehem Steel Corp. v. Grace Lines, Inc., supra,* decided some four years before the 1973 award of the Savoy contract in this traditionally federal city. The circuit court in *Bethlehem* directed a district court to stay proceedings in a contract dispute and refer the matter to the administrative agency for an initial inquiry. *Bethlehem,* says the majority here (with more aplomb than that displayed by the federal court), is distinguishable because there is no dispute whatever that Savoy could not get redress under the administrative procedures of the agreement. One need only read Article 3 of the contract to dispel this notion. The majority's assertion that neither the Contracting Officer nor the Board has "jurisdiction" to compensate Savoy for increased costs from delays caused by faulty specifications does violence to the plain language of the contract. Article 3 specifically provides for the resolution of disputes concerning "the cost of performing the work" or "the time required for its performance" because of changes in drawings or specifications; it unambiguously requires that any such dispute be determined by the Contracting Officer, subject to appeal to the Contract Appeals Board, under the all-

**2.** The court, in reversing a Court of Claims holding that factual issues of delay on a claim of breach of contract could be resolved de novo in a judicial trial, noted at 384 U.S. 419, 86 S.Ct. at 1558.

Both the disputes clause and the Wunderlich Act categorically state that administrative findings on factual issues relevant to questions arising under the contract shall be final and conclusive on the parties. There is no room in the language of [the disputes clause] or of the Act to consider factual findings final for some purposes but not for others. It would disregard the parties' agreement to con-

clude, as the Court of Claims did, that because the court suit was one for breach of contract which the administrative agency had no authority to decide, the court need not accept administrative findings which were appropriately made and obviously relevant to another claim within the jurisdiction of the board.

The position of the Court of Claims would permit erosion of the policies behind both the Wunderlich Act and the disputes clause. Any claim, whether within or without the disputes clause can be couched in breach of contract language. . . .

inclusive language of Article 15. *See supra* note 1.

I am at a total loss, therefore, to understand how Savoy, or this court, could conclude that the contractor had the option of by-passing the Board and placing this dispute before a jury. Actually, what the majority has done today is to sanction a race to the courthouse by a disgruntled contractor who has refused to wait for the contractually-agreed upon process for the resolution of disputes. The majority seeks to minimize the effect of its holding by noting that because of administrative and statutory provisions coming into existence subsequent to the award of this contract, it anticipates little, if any, repetition before this court of the issue we address here.[3] Even if this were a relevant consideration, it is of no moment in construing the intent of the parties in signing this contract, an intent which is plain from the language they used. Moreover even if we had any reason to look outside the four corners of the contract, I read the administrative regulations[4] and the recently enacted legislation[5] as merely confirming what was settled policy at the time the contract was awarded. In any event, the majority's dubious prediction is of little or no solace. If a decision is wrong, the error is hardly diminished by speculating upon a low prob-

3. For whatever reason, the majority also suggests that trial judges should be disposed favorably toward requests for stays pending administrative resolutions, in the interests of both prudence and judicial economy. I can only read this as a tacit recognition that such tedious factfinding chores on highly technical (and here, in my view, unsupported) claims should not have been placed before a jury in the first instance.

4. In 1974 the District of Columbia published its policy on the proper mode of resolving disputes arising under government contracts. Bureau of Materiel Management, D.C. Gov't Dep't of Gen. Servs., Materiel Management Manual (1974). The provisions of the Materiel Management Manual were adopted as final administrative rules by the appropriate agency on June 15, 1974. *See* 31 D.C.Reg. 2714 (1984) (Notice of Final Rulemaking); *see also* 33 D.C.Reg. 2698, 2699–2702 (1986) (Notice of Emergency and Proposed Rulemaking). Section 2642.11 of the manual (or rules), setting forth standard contract clauses, explicitly provides in Articles 3 (changes in specifications) and 7 (disputes) that *all* disputes under government contracts are to be resolved in the first instance by the Contracting Officer, with a right of appeal to the Contract Appeals Board, and, only then, with the ultimate right of judicial review on questions of law.

At the time of its adoption, the Manual was described as a "comprehensive *compilation* of the principles, rules, and directions to ensure the judicious use of public funds designated to procure, maintain and dispose of equipment, supplies and services used by the Government of the District of Columbia to carry out its functions." 20 D.C.Reg. 1095 (1974) (Notice of Proposed Rulemaking) (emphasis added); *see also* Materiel Management Manual, *supra*, at Foreword.

5. Recently, the legislature put on a statutory footing what had previously been unambiguously expressed both in its administrative rules and in the contract before us here. On February 21, 1986, the District of Columbia Procurement Practices Act of 1985 came into effect as D.C.Law 6–85, 33 D.C.Reg. 1291 (1986) (codified at D.C.Code §§ 1–1181.1 to –1191.2 (1986 Supp.)). The statute requires *all* claims by aggrieved contractors to be decided first by the equivalent of the Contracting Officer here, with a right of appeal to the Contract Appeals Board, and with recourse to this court from the Board's decision on the same limited basis as that governing our review of the final decision of any other administrative agency. D.C.Code § 1–1188.5, –1189.4, –1189.5, –1189.7 (1986 Supp.).

The legislative history confirms that the Procurement Practices Act of 1985 had no effect on preexisting dispute resolution requirements other than to place them on a statutory footing. As William R. Spaulding, Chairman of the Committee on Government Operations, explained when presenting the bill to his fellow councilmembers:

Title IX of the bill creates a Contract Appeals Board to hear and decide on decisions rendered by the Director [of the Department of Administrative Services] concerning contract disputes.... Both the contractor and the District government can seek judicial review of Board decisions. The District's present Contract Appeals Board was established by executive order, and *the functions for the Board as provided in the bill are similar to the current functions and authority of the Board.... The current Board is allowed to hear disputes between contractors and the independent agencies, and the intent is to continue this arrangement.*

Council of the District of Columbia, Report on Bill 6–191, District of Columbia Procurement Practices Act of 1985, at 5 (Oct. 10, 1985) (available in the District Building).

ability of its recurrence. The decision here is wrong. It has placed an opinion of this court on a collision course with settled principles of administrative and contract law. Moreover, it has sanctioned the action of Savoy in defeating the contractual arrangement (to which it had unequivocally agreed) of having the merits of this dispute dealt with by factfinders versed in complex and technical procurement issues.[6] It has condoned a tactic whereby Savoy, after the initial rejection of its claim by the Contracting Officer, and for reasons we can only surmise, has filed this suit while the matter was still pending before the Contract Appeals Board. Thus, having reneged upon the dispute resolution agreement, Savoy has drawn an award of almost a million dollars from the public purse by putting its grievance before a jury which had no similar specialized exposure. This is the award that the majority affirms.

I respectfully dissent.

---

**6.** Under the new legislation, members of the Contract Appeals Board, "shall have experience in the areas of procurement and contract law." D.C.Code § 1–1189.2(b) (1986 Supp.); *see also* 33 D.C.Reg. 3006–07 (1986) (Mayor's Order 86–65); 33 D.C.Reg. 1940, 1945 (1986) (Mayor's Order 86–44); *see generally* Note, *Selection and Qualifications of Members of Contract Appeals Boards: A Comment on Alternative Procedures,* 42 GEO.WASH.L.REV. 383 (1973–74). Contracting Officers are similarly qualified. 33 D.C.Reg. 1940–45 (1986) (Mayor's Order 86–44).